**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **Loadcraft Industries, Ltd.** | § | **Case No. 21-11018-tmd-11** |
| | § | |
| Debtors. | § | |

**COMPLAINT FOR DECLARATORY JUDGMENT and EMERGENCY MOTION FOR
TEMPORARY and PERMANENT INJUNCTIVE RELIEF
AND BRIEF IN SUPPORT THEREOF**

**NOTICE**: This pleading requests relief that may be adverse to your interests. If no timely response is filed within 21 days from the date of service, the relief requested herein may be granted without a hearing being held. A timely filed response is necessary for a hearing to be held.

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, BRADY PLANT OPERATORS LLC, by and through its sole member, TERRY MCIVER, the General Partner for DEBTOR LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, Individually, and GLIDER PRODUCTS LLC, hereinafter PLAINTIFFS and MOVANTS, complaining of CHARLES HINKLE, Individually, and in his claimed capacity as MANAGER OF BRADY PLANT OPERATORS, LLC, ALPHONSO ENERGY LLC, GLORIOUS SPLENDOR TOO, LLC, now claiming to be the General Partner of DEBTOR and NESTOR OUTCOMES LLC, hereinafter DEFENDANTS and RESPONDENTS seeking declaratory relief and pursuant to BRCP 7065 and FRCP 65, includes and files this Emergency Motion for Temporary Restraining Order and Injunctive Relief against these same DEFENDANTS AND RESPONDENTS and in support would show as follows:

---

**COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT**        **Page 1 of 15**

**I.**

**PARTIES**

1.      Plaintiff/Movant BRADY PLANT OPERATORS, LLC is a Texas limited liability company.

2.      Plaintiff /Movant GLIDER PRODUCTS LLC is a Texas limited liability company in good standing.

3.      Plaintiff/Movant TERRY MCIVER is an individual residing in Coleman,Texas.

4.      Defendant/Respondent CHARLES HINKLE, is an individual residing in South Carolina that due to the time sensitive injunctive request, service is being made via e-mail to his attorney in the underlying state court litigation.

5.      Defendant/Respondent ALPHONSO ENERGY, LLC, is a Texas Limited liability company, that due to the time sensitive injunctive request, service is being made via e-mail to its attorney in the underlying state court litigation.

6.      Defendant/Respondent GLORIOUS SPLENDOR TOO LLC, is a Texas Limited liability company, that due to the time sensitive injunctive request, service is being made via e-mail to its attorney in the underlying state court litigation.

7.      Defendant/Respondent NESTOR OUTCOMES LLC, is a Texas Limited liability company, that due to the time sensitive injunctive request, service is being made via e-mail to its attorney in the underlying state court litigation.

**II.**

**JURISDICTION AND VENUE**

1.      LOADCRAFT INDUSTRIES, LTD, is a chapter 11 debtor before the United States Bankruptcy Court for the Western District of Texas, Austin Division.

---

**COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT**                    **Page 2 of 15**

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 §§ 157(a), and 1334(a). Jurisdiction to grant declaratory relief exists pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. § 105, and Fed. R. Bankr. P. 7001(2) and 7001(9).

3.      This Court has personal jurisdiction over all defendants. The exercise of personal jurisdiction over all defendants is consistent with the Constitution and laws of the United States. Furthermore, there is personal jurisdiction over all defendants pursuant to Fed. R. Bankr. P. 7004(f).

4.      This proceeding is a core proceeding within the meaning of 28 U.S.C. §§157(b)(2)(A) (concerning the administration of the estate), 157(b)(2)(M) (concerning the use of property, including cash collateral), and 157(b)(2)(O) (including other proceedings affecting liquidation of estate assets or adjustment of the debtor-creditor relationship).

5.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C. §1409(a).

### III.

### CONDITIONS PRECEDENT

6.      All conditions precedent necessary to maintain this action have occurred or have been performed.

### IV.

### NATURE OF ACTION

7.      This is an action for declaratory judgment made pursuant to Fed. R. Bankr. 7001(2) and 7001(9), and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq. Plaintiffs seek a declaratory judgment determining the General Partner status and authority for

---

the DEBTOR LOADCRAFT INDUSTRIES LTD and the continued management and operations of the DEBTOR.

## V.

### BACKGROUND

8. Debtor Loadcraft Industries Ltd is a Texas Limited Partnership with Brady Plant Operators LLC as its General Partner.

9. Brady Plant Operators LLC is a Texas sole member Limited Liability Corporation with Terry McIver as its sole member.

10. In 2017, Alphonso Energy LLC invested in Loadcraft Industries ltd in return for a 50% limited partnership interest.

11. In 2016, Nestor Outcomes LLC invested in Loadcraft Industries Ltd and then pursuant to the 2017 Alphonso Energy Ownership Agreement to a 15% limited partnership interest.

12. In 2017, the Alphonso Energy Ownership Agreement ("Alphonso Agreement") was entered into to reflect these new limited partners and their respective interests and a true and correct copy of that purchase agreement is attached hereto as Exhibit "A". In the attached, it specifically provides for Terry McIver, as sole member of BPO, the general partner, to effectuate the removal of two current managers and replace with Charles Hinkle and an entity related to Alphonso Energy (a limited partner) named Glorious Splendor Too, LLC. The only proviso was that as long as Alphonso Energy remained a limited partner, then Glorious Splendor could not be removed as a manager. There was no such proviso as to the removal of Charles Hinkle.

---

13. The Alphonso Agreement also made several changes to the Agreement of Limited Partnership of Loadcraft Industries Ltd., a true and correct copy of which is attached hereto as Exhibit "B." Specifically, it changed the limited partners, the interest owned by the limited partners and changed how the General Partner could be removed from a majority of interest vote to a majority of the limited partners vote. See Section 5 of Exhibit "A" and Sections 6.11 and 12.2 of Exhibit "B." It is of note that all limited partners and the general partner signed the Alphonso Agreement.

14. Charles Hinkle was the CEO and CFO of Loadcraft from May of 2016 until November of 2019 and then continued as CFO until he abruptly left in early November of 2020 without notice. In November of 2019, based on an agreement between managers McIver and Glorious Splendor, Hinkle was removed as CEO and Terry McIver was instated as CEO of Loadcraft Industries Ltd. Further, Charles Hinkle was removed as a manager for the general partner effective November 11, 2020. A true and correct copy of the Unanimous Consent to remove Hinkle is attached hereto as Exhibit "C."

15. In December of 2020, the relationship between Alphonso Energy member Brian Alphonso and Terry McIver began to deteriorate. Charles Hinkle also made demand on Loadcraft for monies he believed were still owed to him.

16. In the Spring of 2021, negotiations between Alphonso Energy and Loadcraft through Terry McIver were undertaken to resolve their differences. There was no resolution reached.

17.     On or about June 16, 2021, suit was filed in state court against MOVANTS MCIVER and GLIDER and DEBTOR LOADCRAFT as referenced above. A counterclaim against CHARLES HINKLE was filed by DEBTOR LOADCRAFT and a third-party claim against BRIAN ALPHONSO was filed by MOVANT MCIVER. A true and correct copies of the pleadings in this suit are attached hereto as Exhibit "D." This suit is ongoing and in the discovery phase.

18.     On December 30, 2021, CHARLES HINKLE, as a manager of BRADY PLANT OPERATORS LLC, the general partner of DEBTOR LOADCRAFT, authorized and signed the filing of this bankruptcy, despite having been removed as a manager and despite having quit working for DEBTOR LOADCRAFT in November of 2020. Further, shortly before filing the bankruptcy, CHARLES HINKLE and GLORIOUS SPLENDOR TOO evidently executed a corporate resolution to effectuate the bankruptcy and to "fire" MOVANT MCIVER and ban him from the premise. Attached hereto as Exhibit "E" is a true and correct copy of the corporate resolution provided to MOVANT MCIVER. Of course, it is MOVANTS contention this was unauthorized and illegal.

19.     On December 31, 2021, two of the limited partners, RESPONDENTS ALPHONSO ENERGY LLC and NESTOR OUTCOMES LLC, also executed a corporate resolution to remove MOVANT BRADY PLANT OPERATOR LLC as the General Partner of DEBTOR LOADCRAFT and substitute GLORIOUS SPLENDOR TOO LLC as the General Partner and again, "fire" MOVANT MCIVER and deny his access. Attached hereto as Exhibit "F" are true and correct copies of these corporate resolutions as provided by opposing counsel to

MOVANT MCIVER. As with HINKLE'S actions, this attempt fails as it violates the Alphonso Agreement (Ex A) as only 2 of the 3 necessary limited partners agreed to the resolution.

20.     BRADY PLANT OPERATORS LLC asserts it is still the General Partner of DEBTOR LOADCRAFT and under the terms of the operating agreement (Ex. B) and Alphonso Agreement (Ex. A), should be the Debtor-in-Possession and operating and managing the DEBTOR.

## VI.
### CAUSES OF ACTION: FIRST CAUSE OF ACTION: DECLARATION OF GENERAL PARTNER STATUS FOR DEBTOR AND AUTHORITY FOR MANAGEMENT AND OPERATIONS OF DEBTOR

1.     Plaintiffs incorporate all prior paragraphs into this section to the extent not inconsistent as if fully set forth herein.

2.     This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. §2201 and rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure.

3.     In a case of actual controversy within its jurisdiction, except with respect to inapplicable exceptions, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C. § 2201(a). Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. 28 U.S.C. § 2201(a).

4.     An actual case or controversy exists because DEFENDANTS, on two (2) occasions have wrongfully and without authorization executed Corporate Resolutions (Exs E and F) claiming to first (Ex E), be managers and have management authority of BRADY PLANT OPERATORS LLC, the General Partner of DEBTOR LOADCRAFT INDUSTRIES LTD, authorizing the filing

of this bankruptcy and the removal of TERRY MCIVER as CEO of DEBTOR, and blocking all access to the physical location, the computers, and personal and confidential information. Then, the day after filing this Bankruptcy (12/31/21), a new and also unauthorized set of corporate resolutions (Ex F) were executed attempting to insert a new General Partner, DEFENDANT GLORIOUS SPLENDOR TOO LLC, for DEBTOR LOADCRAFT. Again, all of these corporate resolutions and attempted acts were not done incompliance with the governing operating agreements as set out in attached Exhibits A and B.

## VII.
### CAUSES OF ACTION: SECOND CAUSE OF ACTION: MOTION FOR EMERGENT INJUNCTIVE RELIEF AND BRIEF IN SUPPORT

1.      Plaintiffs incorporate all prior paragraphs into this section to the extent not inconsistent as if fully set forth herein.

2.      Movants move for injunctive relief under BRCP 7065 and FRCP 65 against DEBTOR related CHARLES HINKLE, Individually, and in his claimed capacity as MANAGER OF BRADY PLANT OPERATORS, LLC, ALPHONSO ENERGY LLC, GLORIOUS SPLENDOR TOO, LLC and NESTOR OUTCOMES LLC as immediate and irreparable harm will occur if an immediate temporary restraining order is not entered and a subsequent temporary injunction not issued. Respondents have filed this bankruptcy without authorization, taken effective control of the DEBTOR without authorization, have wrongfully limited physical and computer access to TERRY MCIVER, sole member manager of BRADY PLANT OPERATORS LLC, the General Partner to DEBTOR LOADCRAFT INDUSTRIES LTD, and are clearly attempting to or have taken possession of numerous confidential and privileged communications and

documents generated in the related state court litigation styled ALPHONSO ENERGY LLC, CHARLES HINKLE and NESTOR OUTCOMES LLC, Plaintiffs, v. LOADCRAFT INDUSTRIES LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC, Defendants and Third-Party Plaintiff, CAUSE NO. D-1-GN-21-002825, 98th Judicial District Court, Travis County, Texas. To allow these parties, adverse to MOVANTS in the state court litigation, access to privileged and confidential communications, would cause immediate and irreparable harm to movants in the contested state court action. Immediate and irreparable harm will come to the DEBTOR as Respondents are not familiar with the day-to-day operations, not familiar with current or anticipated contracts and obligations and generally do not know the direction and management of the company which will lead to immediate and irreparable harm. Further, MOVANT TERRY MCIVER has personal effects and personal confidential information he is being blocked from retrieving and accessing. Further, some of the corporate information and documentation for MOVANT GLIDER PRODUCTS LLC is on the premise of LOADCRAFT and effectively blocked by Respondents.

3.     The status quo is for the continuation of MOVANT BRADY PLANT OPERATORS LLC, through its duly appointed managers, to continue as General Partner for LOADCRAFT INDUSTRIES LTD pending the final determination of the state court action.

4.     Movants are willing to post security as deemed proper by the Court.

5.     Each specific element of the defenses and claims upon which this motion is brought are set forth in the brief in support. This motion is based on the pleadings and papers on file in this case and the attached memorandum of points and authorities.

---

**COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT**     **Page 9 of 15**

6.     Due to the wrongful attempts to exert control over DEBTOR LOADCRAFT and MOVANT MCIVER and their wrongful attempts to access privileged and confidential information as set out in the various resolutions, MOVANTS seek INJUNCTIVE RELIEF and PROTECTION from this Court.

7.     BRADY PLANT OPERATORS LLC, by and through its sole member, TERRY MCIVER, the general partner for DEBTOR LOADCRAFT INDUSTRIES, LTD., file this its brief in support of its motion for temporary restraining and injunctive relief and ask the presiding judge to grant their motion for temporary restraining order pursuant to BRCP 7065.5.

8.     Pursuant to BRCP 7065.5 and FRCP 65, Movant believes an ex parte temporary restraining order is proper, but is moving for an emergent and expedited hearing on the requested injunction ordering that CHARLES HINKLE, BRIAN ALPHONSO, their respective companies, employees, agents and lawyers do not and shall not have access, look at or otherwise gain knowledge of the content of any privileged communications by and between or at the direction of the lawyers for Defendants in the state court litigation and TERRY MCIVER, LOU COLLAZO and/or KENDRA OLDHAM, any documents and drafts of documents of work product generated by the lawyers for Defendants in the state court litigation or documents and drafts of documents generated at the request of the lawyers for Defendants; including, but not limited to any such communications or documents stored on computers or in print. Further, CHARLES HINKLE, BRIAN ALPHONSO, their respective companies, employees, agents and lawyers do not and shall not have access, look at or otherwise gain knowledge of the content of any personal or otherwise confidential e-mail, document or physical tangible thing of TERRY MCIVER.

Still further, CHARLES HINKLE, BRIAN ALPHONSO, their respective companies, employees, agents and lawyers do not block access by TERRY MCIVER and/or LOU COLLAZO to their computers, e-mails and personal property and effects. Finally, CHARLES HINKLE, BRIAN ALPHONSO, their respective companies, employees, agents and lawyers be ordered to vacate the Loadcraft Premise, be precluded from any management or employment operations and the status quo be restored to where BRADY PLANT OPERATORS LLC acts as General Partner for DEBTOR LOADCRAFT until further order of this Court.

9.     The Fifth Circuit follows the traditional four-part test, in which the movant must show: (1) A substantial likelihood of success on the merits; (2) A substantial threat of irreparable harm if the injunction is not granted; (3) That the threatened injury outweighs any harm that the injunction might cause to the non-movant; and (4) That the injunction will not disserve the public interest. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *Tex. Midstream Gas Serv., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).

10.     A review of the attached Alphonso Agreement, Limited Partnership Agreement for Loadcraft and the Unanimous Consent removing Charles Hinkle as a manager of Brady Plant Operators LLC (Exs. A, B and C, respectively), shows that Respondents did not have the authority to do anything they are attempting as evidenced by their various corporate resolutions (Exs E and F), including the filing of this bankruptcy and certainly did not have the authority to try and take over Debtor Loadcraft Industries, firing Terry McIver and barring him from the facilities, and claiming ownership and access to hundreds of privileged and confidential documents from the state court litigation. As

such, number one is met as a substantial likelihood exists for success by MOVANTS on the merits.

11.     As evidenced by the affidavit of Terry McIver attached hereto and the facts as set out above, the harm is immediate and irreparable to both himself individually, but also to the DEBTOR, to the general partner of the DEBTOR, the remaining defendant in the state court action, MOVANT GLIDER.

12.     The granting of the temporary restraining order and the temporary injunction will not cause any harm to the Respondents as these claimed issues have been prevalent in the state court litigation.

13.     There is no disservice to the public interest.

14.     An Emergent Temporary Restraining Order is proper and a separate motion or Expedited Hearing is being filed in conjunction.

15.     Finally, pursuant to BRP 7065.5, the undersigned counsel tried to work out an agreed protective order with opposing counsel concerning the privileged and protected communications in the possession of DEBTOR LOADCRAFT, but no agreement could be reached by the time of filing and therefore, due to the high likelihood of substantial, immediate and irreparable harm to the Movants, an Ex Parte Temporary Restraining Order would likely be proper.  However, alternatively, an expedited hearing on the injunctive relief sought is what is being requested and should be held as soona s the Court's schooled permits. As the Court will see from the attached corporate resolutions the intent to access the privileged and confidential communications and work product, along with neither the opposing counsel in the bankruptcy nor the opposing counsel in the state court litigation agreeing to not access such privileged communications and work

product, it appears that they have likely already accessed these items or will do so while waiting on a hearing. Again, while the granting of an Ex Parte Temporary Restraining Order is proper, Movants are filing a motion for expedited hearing on their application for injunctive relief in lieu of the request for an Ex Parte order.

16.     Again, the Movants are willing to post the required security with the court.

## VIII.
### CAUSES OF ACTION: THIRD CAUSE OF ACTION: RECOVERY OF ATTORNEYS' FEES AND COSTS

1.     Plaintiffs incorporate all prior paragraphs into this section to the extent not inconsistent as if fully set forth herein.

2.     Pursuant to Section 506(b) of the Bankruptcy Code and 28 U.S.C. § 2202, Plaintiffs seek recovery of all reasonable and necessary attorneys' fees, interest, and costs incurred in enforcing their rights related to this proceeding.

## IX.
### RESERVATION OF RIGHTS

This complaint is made in good faith and is based on information reasonably known or available to Plaintiffs as of the time of filing. Plaintiffs reserve the right to amend this complaint based on new or unknown information subsequently located, received, or revealed or as otherwise allowed by law of this Court.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court (1) grant the immediate injunctive relief as requested: (2) enter a declaratory

judgment substantially in the form as detailed above; (3) award Plaintiffs their reasonable

attorneys' fees, interest, and costs incurred; and (4) such other relief as is just and proper.

Respectfully submitted,

**MCMAHON SUROVIK SUTTLE, P.C.**
P.O. Box 3679
Abilene, Texas 79604
(325) 676-9183 Telephone
(325) 676-8836 Facsimile

BY: /s/ Robert B. Wagstaff
**ROBERT B. WAGSTAFF**
State Bar No. 20665000

rwagstaff@mcmahonlawtx.com

ATTORNEYS FOR PLAINTIFFS/MOVANTS

## CERTIFICATE OF CONFERENCE

This is to certify that a conference via e-mail exchange and drafts of a proposed Agreed Protective Order on the injunctive relief sought concerning the privileges and access was held with opposing counsel from December 31 through today, January 4, 2022, and agreement on said relief could not be reached, at last as of this filing. As such, the request for temporary injunctive relief is submitted to the court for determination.

/s/ Robert B. Wagstaff

### **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was served on counsel for the Debtor, Eric J. Taube, Waller Lansden Dortch & Davis, 100 Congress Ave, Suite 1800, Austin, TX, 78701, via electronic mail eric.taube@wallerlaw.com, via electronic mail, and counsel for the Defendants, Katherine Walters, Richie & Gueringer PC, 100 Congress Ave, Suite 1750, Austin, TX, 78701, via electronic mail kwalters@rg-austin.com, and the DEBTOR and any parties requesting notice herein, via the Court's ECF noticing system, on this the 4th day of January, 2022.

/s/ Robert B. Wagstaff

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **In Re:** | § | **Chapter 11** |
| | § | |
| **Loadcraft Industries, Ltd.** | § | **Case No. 21-11018-tmd-11** |
| | § | |
| **Debtors.** | § | |

### AFFIDAVIT OF TERRY MCIVER

BEFORE ME, the undersigned authority, personally appeared TERRY MCIVER, who being duly sworn, deposed as follows:

"My name is TERRY MCIVER. I am over 18 years of age, of sound mind and capable of making this Affidavit. I am the managing sole member of Brady Plant Operators LLC, the general partner of Debtor Loadcraft Industries, Ltd., and the managing member of Defendant Glider Products, LLC. I have also been the CEO of Debtor Loadcraft since November of 2019. Accordingly, the factual averments stated in this Affidavit are within my personal knowledge and are true and correct.

"I have read Brady Plant Operators LLC's Complaint and Request for Declaratory Judgment and Emergency Motion for Injunctive Relief and the factual averments contained therein are true and correct. Further, the attached Exhibits "A" through "F" to the complaint are true and correct copies of these documents.

Charles Hinkle was both CEO and CFO of Loadcraft from May of 2016 until November of 2019 and then continued as CFO until he abruptly left in early November of 2020 without notice. Further, in conjunction with the Alphonso Energy Ownership Agreement (Exhibit "A"), Charles Hinkle and Glorious Splendor Too LLC, a company related to Alphonso Energy LLC, were elected by me in my capacity as sole member of Brady Plant Operators LLC, as managers (along with myself) of Brady Plant Operators LLC, the general partner of Loadcraft Industries Ltd. In early 2021, after Mr. Hinkle quit his role of CFO of Loadcraft Industries Ltd., I executed the November 11, 2020 (effective date), removal of Charles Hinkle as a manager and replaced him with Grady

McIver (Exhibit "C"). Glorious Splendor Too LLC remained a manager as per the Alphonso Energy Ownership Agreement (Exhibit "A"). At no time since his abrupt departure and up to the time he executed the Corporate Resolution a few days ago (Exhibit "E") has Charles Hinkle even attempted to act as a manager or further the business of Loadcraft Industries Ltd. Just the opposite, he sued Loadcraft. Regardless, the filing of the bankruptcy petition and signature by Charles Hinkle as manager of Brady Plant Operators LLC were false, unauthorized and a gross misrepresentations of his status with Brady Plant Operators LLC and Loadcraft Industries Ltd.

Further, Mr. Hinkle met with the employees of Loadcraft Industries Ltd Friday morning, December 31, 2021, and upon information and belief, he changed the locks and instructed Gary Weatherman, the VP of Engineering, to call the police if either myself or Lou Collazo, the CFO, showed up on Monday, January 3, 2022, at the Loadcraft Plant, obviously attempting to block our access to the plant, our offices and our computers. Further, upon information and belief, Mr. Hinkle instructed the IT person to access our computers and block our access. It is unclear what other instructions or access Mr. Hinkle is attempting or contemplating, but these computers, mine and Collazo's, along with Controller Kendra Oldham, contain many privileged communications by and between or at the direction of our lawyers in the state court litigation styled ALPHONSO ENERGY LLC, CHARLES HINKLE and NESTOR OUTCOMES LLC, Plaintiffs, v. LOADCRAFT INDUSTRIES LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC, Defendants and Third-Party Plaintiff, CAUSE NO. D-1-GN-21-002825, 98th Judicial District Court, Travis County, and from the pre-litigation communications concerning strategy and possible resolution. Further, these computers and offices contain personal and confidential information, as well as confidential information on my other business interests and entities. Access to this information by Plaintiffs in the state court action and failing to allow me access would cause irreparable and immediate harm to me and to my interests, as well as DEBTOR Loadcraft and Glider Products in both the state court litigation and in other related business and personal interests.

Yesterday, January 3, 2022, we received a new set of corporate resolutions from Alphonso Energy LLC, Nestor Outcomes LLC and Glorious Splendor LLC, attempting to remove Brady Plant Operators LLC as the general partner of DEBTOR Loadcraft Industries. (Exhibit "F") Again, their attempts to take over Loadcraft are misplaced under the terms of the Alphonso Agreement (Exhibit "A") and the Agreement of Limited Partnership of Loadcraft Industries Ltd., (Exhibit "B"), as they do not have the required votes from the limited partners and they then assert the same

claims that Hinkle's corporate resolution claimed, to wit, the right to fire me, lock me out, access my computer and personal information and take over DEBTOR Loadcraft's management and operations.

The blocking of our access and the attempts to take over control of DEBTOR Loadcraft Industries will also cause immediate and irreparable harm due to ongoing business and contractual obligations, along with ongoing negotiations with third parties for several advantageous and lucrative contracts with DEBTOR Loadcraft. Neither Hinkle nor Alphonso have had anything to do with the day-to-day operations of DEBTOR Loadcraft and do not know what is happening, what contracts and obligations are in place or the current management of the business to be a Debtor-in-Possession, and certainly will not be in a position to continue negotiations on prospective business dealings. Each day that Hinkle and Alphonso are allowed to operate and manage the DEBTOR will cause additional financial and economic harm to the DEBTOR.

Further Affiant sayeth not."



TERRY MCIVER, Sole Member of BRADY
PLANT OPERATORS LLC, General partner for
LOADCRAFT INDUSTRIES, LTD.

SUBSCRIBED AND SWORN TO BEFORE ME on January 4, 2022, by Terry McIver.

SANDI ELIZABETH GREAVES
Notary ID #129902499
My Commission Expires
July 30, 2022

Notary Public, State of Texas

**Affidavit of Terry McIver**                                                                                    **Page 3 of 3**

# OWNERSHIP OF INTEREST
# AND OPERATIONS AGREEMENT

This Agreement is made and entered into this _24th_ day of May, 2017, by and between Brady Plant Operators, L.L.C. (hereinafter referred to as "BPO"), Huntland Properties, Ltd. (hereinafter referred to as "Huntland"), Huntland Resources, L.L.C. (hereinafter referred to as "Resources"), J Bar T, Ltd (hereinafter referred to as "JBT"), Nestor Outcomes, LLC (hereinafter referred to as "Nestor"), Passerina Ciris, LLC (hereinafter referred to as "Passerina"), Alphonso Energy, LLC (hereinafter referred to as "Alphonso ") and Loadcraft Industries, Ltd (hereinafter referred to as "Loadcraft").

**Whereas,** Huntland Properties, Ltd., Huntland Resources, L.L.C., J Bar T, Ltd, Nestor Outcomes, LLC , and Passerina Ciris, LLC are all the current limited partners in Loadcraft Industries, Ltd;

**Whereas,** Brady Plant Operators, L.L.C. is the general partner of Loadcraft;

**Whereas,** Alphonso desires to make an investment of capital into Loadcraft for a limited partner interest; and

**Whereas,** it is the desire of all the parties to avoid confusion as to the ownership interest in Loadcraft owned by each party, to stipulate and agree to the various changes in ownership of Loadcraft and to agree on management and operational issues regarding Loadcraft.

**Now, Therefore,** for and in consideration of the mutual promises and agreements contained herein, the parties do hereby stipulate and agree as follows:

1.     As of  August 18, 2016 until the present, the ownership of Loadcraft is as follows:

| Partner | Units | Ownership |
|---|---|---|
| Brady Plant Operators, L.L.C. | 171 | .8075% |
| Huntland Resources, L.L.C. | 7,257 | 34.2924% |
| Huntland Properties, Ltd. | 5,148 | 24.3265% |
| J Bar T, Ltd. | 1,709 | 8.0757% |
| Nestor Outcomes, LLC | 4,761 | 22.4979% |
| Passerina Ciris, LLC | 2,116 | 10.0000% |
| Total | 21,162 | 100.0000% |

2.     On May _25th_, 2017 Alphonso  will invest the sum of $2,400,000 into Loadcraft as a capital contribution for a 50% ownership interest in Loadcraft at a per unit cost of $226.82. At such time JBT agrees that its limited partner interest in Loadcraft is abandoned.  In connection with the capital contribution the ownership interest of Huntland, Resources, Nestor and Passerina will be reduced.  Accordingly as of May ___, 2017and going forward and until changed the parties agree that the ownership of Loadcraft is stipulated and agreed to be as follows:

_B. A_

**EXHIBIT "A"**

| Partner | Units | Ownership |
|---|---|---|
| Brady Plant Operators, L.L.C. | 171 | .8075% |
| Huntland Resources, L.L.C. | 3,616 | 17.0870% |
| Huntland Properties, Ltd. | 2,566 | 12.1253% |
| Alphonso Energy, LLC | 10,581 | 50.0000% |
| Nestor Outcomes, LLC | 3,174 | 15.0000% |
| Passerina Ciris, LLC | 1,054 | 4.9802% |
| Total | 21,162 | 100.0000% |

New unit certificates will be issued as soon as possible.

3.      As noted above, BPO is the general partner of Loadcraft. Terry McIver will obtain the resignation of Donald L. Barley and Raymond E. Jones, Jr. as managers of BPO. In their place Terry McIver, as sole member of BPO, will elect Charles Hinkle and Glorious Splendor Too, LLC as Managers of BPO to replace Donald L. Barley and Raymond E. Jones, Jr. The parties agree that Glorious Splendor Too, LLC shall remain a Manager of BPO so long as Alphonso is a limited partner.

4.      The parties desire to provide for continuity of management of Loadcraft. The parties further acknowledge that Section 6.3 of the Loadcraft Partnership Agreement provides that Terry McIver will be paid a management fee as part of an employment agreement between he and Loadcraft. No formal management agreement has been entered into, instead he has historically been paid a fee equal to 10% of all partner's distributions. In order to provide for the management continuity as noted above, the parties agree to amend Section 6.3 of the Partnership Agreement to provide for a management fee for Terry McIver and an employment agreement for Charles Hinkle. The parties will negotiate the management fee agreement and the employment agreement in good faith and the agreements must be entered into no later than June 16, 2017. Notwithstanding the terms of the Partnership Agreement to the contrary, it is agreed that these agreements must be approved by the limited partners by unanimous vote of all limited partners.

5.      Section 6.11 of the Partnership Agreement provides that the General Partner may be removed as General Partner upon a Majority in Interest vote of Limited Partners. In order to preserve the existing operational management decision making of Loadcraft the parties agree that said Section 6.11 will be amended to require the affirmative vote of a majority of the Limited Partners in order to remove and/or change the General Partner. Huntland and Resources will collectively be entitled to one vote and each other limited partner will be entitled to one (1) vote on this matter.

6.      As part of the negotiations for the capital contribution by Alphonso the parties have agreed to the uses of and disbursement of such funds by Loadcraft. Accordingly the parties agree that the contribution by Alphonso will be disbursed and used for the purposes as listed on Exhibit A attached hereto.

7.      Loadcraft currently owes money to various limited partners. It owes Nestor the sum of $75,000, Huntland the sum of $705,938.55 and Passerina the sum of $950,000. The parties agree that distributions to pay taxes not to exceed 40% of net profits will be made before repayment of the principal on the Nestor and Passerina debts. In order to avoid conflict the parties agree that the

$B.A$

limited partners must agree before this debt can be repaid.  Notwithstanding the terms of the Partnership Agreement to the contrary, it is agreed that the debts to Nestor and Passerina cannot be paid unless the limited partners agree to pay these debts by vote.  Huntland and Resources will collectively be entitled to one vote and each other limited partner will be entitled to one (1) vote on this matter with a majority necessary in order to make partial or full payment of these debts.  With respect to the Huntland debt, this debt is documented with a promissory note requiring monthly payments.  These monthly payments will continue as provided for in the note.  However if Loadcraft is able to pay this debt in full the same requirement as stated above will be required.  Interest payments on these debts will continue and will not require partner approval for payment thereof.

8.      Loadcraft currently does not have any direct line of credit with a financial institution to use in its daily business operations.  Instead Terry McIver has arranged a line of credit for an entity of his, Cornerstone Operating, L.L.C. with Citizens National Bank in Brownwood which is being used in effect as Loadcraft's line of credit.  The parties agree that this liability of Loadcraft will be considered and treated as a bank obligation and not debt of Loadcraft owed to its owners, payment of which is addressed above in Paragraph 7.

9.      The parties hereto agree that the Partnership Agreement will be amended in its entirety on or before December 31, 2017.  All limited partners must agree to the changes in the Partnership Agreement.

10.     The Stipulation of Interest portions of this Agreement shall contain such words of grant as are required to accomplish the above described results.

11.     Each of the parties hereto ratifies and confirms the Agreement of Limited Partnership of Loadcraft Industries, Ltd. dated November ___, 2004, except to the extent it conflicts with the terms of this Agreement.

12.     New and replacement unit certificates will be issued to all parties after execution of this Agreement.

13.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, personal representatives, heirs, successors and assigns.

14.     This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

15.     Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments reasonably necessary to effectuate this Agreement.

**Executed and Effective** as of the days and year above written.

Loadcraft Industries, Ltd.

By _____
Terry Lynn McIver, President of
Brady Plant Operators, L.L.C.,
General Partner of
Loadcraft Industries, Ltd.

Brady Plant Operators, L.L.C.

By _____
Terry Lynn McIver, President

Huntland Properties, Ltd.

By _____
Terry Lynn McIver, President of
Cornerstone Operating, L.L.C.,
General Partner of
Huntland Properties, Ltd.

Huntland Resources, L.L.C.

By _____
Terry Lynn McIver, President

J Bar T, Ltd.

By _____
Donald L. Barley, President of
KDLT Resources, L.L.C.,
General Partner of
J Bar T, Ltd.

Nestor Outcomes, LLC

By _____
Charles Hinkle,
Sole Member and Manager

Alphonso Energy, LLC

By _____
Brian Alphonso, Manager

Passerina Ciris, LLC

By _Ruth Ann McIver_
Ruth Ann McIver, President

**AMENDMENT TO**
**OWNERSHIP OF INTEREST**
**AND OPERATIONS AGREEMENT**

This Amendment to Ownership of Interest and Operations Agreement (hereinafter the "Amendment") is made and entered into this _____ day of May, 2017, by and between Brady Plant Operators, L.L.C. (hereinafter referred to as "BPO"), Huntland Properties, Ltd. (hereinafter referred to as "Huntland"), Huntland Resources, L.L.C. (hereinafter referred to as "Resources"), J Bar T, Ltd (hereinafter referred to as "JBT"), Nestor Outcomes LLC (hereinafter referred to as "Nestor"), Passerina Ciris, LLC (hereinafter referred to as "Passerina"), Alphonso Energy, LLC (hereinafter referred to as "Alphonso"), and Loadcraft Industries, Ltd (hereinafter referred to as "Loadcraft").

**Whereas**, BPO, Huntland, Resources, JBT, Nestor, Passerina, Alphonso and Loadcraft entered into the Ownership of Interest and Operations Agreement dated May _____, 2017 (hereinafter, the "Agreement"), a copy of which is attached as the hereby incorporated Exhibit A;

**Whereas**, the parties mutually intend and desire to amend the Agreement as set forth herein.

**Now, Therefore**, for and in consideration of the mutual promises and agreements contained herein, the parties do hereby stipulate and agree as follows:

1. As of the date first set forth above, the Agreement is amended to include the following provision:

The parties agree that Alphonso shall have the option to require Loadcraft make an Internal Revenue Code section 754 election (754 election) when it files its 2017 limited partnership tax return. Prior to the filing of Loadcraft's 2017 tax return, the tax preparer shall request of Alphonso whether it wants to have Loadcraft make the 754 election. Alphonso shall respond by email or letter about its decision to the tax preparer within 30 days of receipt of the request.

2. In the event of any conflict or inconsistency between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall take precedence.

**Executed and Effective** as of the day and year first above written.

Loadcraft Industries, Ltd.

By: _____
Terry Lynn McIver, President of Brady
Plant Operators, L.L.C., General Partner
of Loadcraft Industries, Ltd.

Brady Plant Operators, L.L.C.

By: _____
Terry Lynn McIver, President

Huntland Properties, Ltd.

By: _____

Terry   Lynn   McIver,   President   of
Cornerstone Operating, L.L.C., General
Partner of Huntland Properties, Ltd.


Huntland Resources, L.L.C.

By: _____

Terry Lynn McIver, President


J Bar T, Ltd.

By: _____

Donald L. Barley, President of KDLT
Resources, L.L.C., General Partner of J
Bar T, Ltd.


Nestor Outcomes, LLC

By: _____

Charles   Hinkle,   Sole   Member   and
Manager


Alphonso Energy, LLC

By: _____

Brian Alphonso, Manager


Passerina Ciris, LLC

By: _____

Ruth Ann McIver, President

# EXHIBIT A
## Ownership of Interest and Operations Agreement

*[Immediately Follows.]*

AGREEMENT OF LIMITED PARTNERSHIP
OF
LOADCRAFT INDUSTRIES, LTD.

This Agreement of Limited Partnership of LOADCRAFT INDUSTRIES, LTD. (the **"Agreement"**) is made and entered into by and among BRADY PLANT OPERATORS, L.L.C., a Texas limited partnership (the **"General Partner"** or **"BPO"**), HEARTLAND INVESTMENT PARTNERS, LTD. (**"Heartland"**), J BAR T, LTD. (**"J Bar T"**) HUNTLAND RESOURCES, L.L.C., (**"Huntland Resources"**) HUNTLAND PROPERTIES, LTD. (**"Huntland Properties"**) and WINDOW OPERATING, LTD. (**"Window"**), as limited partners (the **"Limited Partners"**). The General Partner and the Limited Partners are also hereinafter sometimes referred to as a **"Partner"** in the singular or the **"Partners"** in the plural.

## RECITALS

KDLT Resources, L.L.C. ("KDLT") was the initial general partner of the Partnership. After the initial formation, KDLT assigned its interest as general partner to BPO. For purposes herein, BPO will be considered the General Partner.

The Partners desire to form an entity for purposes of acquiring the certain assets of HRI Oilfield, L.P., at Texas limited partnership ("HRI"), Heartland Rig International, LLC, a Texas limited liability company ("International"), Heartland Intermodal, Inc., a Delaware corporation ("Intermodal"), and Partech, LLC, a Louisiana limited liability company, ("Partech") (collectively "Sellers") covered by that certain Asset Purchase Agreement between Sellers and Huntland Resources, and consolidating the ownership of certain properties owned by the Partners in order to provide for a more efficient means of handling the ownership and management of such properties and in order to enhance the value of such properties in the future. Also, in order to provide for the centralized management of the Partnership and the ongoing management and control of the Partnership upon the death or incapacity of a family member, the parties desire to set forth provisions for the appointment of a successor general partner if the General Partner fails or ceases to serve as General Partner.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing Recitals and the mutual covenants and agreements contained herein, the Parties agree as follows:

**EXHIBIT "B"**

## ARTICLE I

## Formation

**Section 1.1. Formation**. The parties hereby form a limited partnership (the **"Partnership"**), under and pursuant to the Texas Revised Limited Partnership Act, Article 6132a-1 of the Revised Civil Statutes of the State of Texas (the **"Act"**).

**Section 1.2. Name.** The name of the Partnership is **"LOADCRAFT INDUSTRIES, LTD."** The business of the Partnership shall be conducted in the name of the Partnership unless under the law of some jurisdiction in which the Partnership does business such business is required to be conducted under another name. In such a case, the business of the Partnership in such jurisdiction may be conducted under such other name or names as the General Partner may select.

**Section 1.3. Purpose.** The Partnership is hereby formed for the purpose of acquiring assets, manufacturing and selling oilfield drilling equipment and other heavy machinery, and such other purposes as may be agreed upon by the Partners from time to time.

**Section 1.4. Registered Office and Registered Agent; Principal Place of Business.**

(a) The registered office of the Partnership required by the Act to be maintained in the State of Texas shall be the initial registered office named in the Certificate or such other office (which need not be a place of business of the Partnership) as the General Partner may designate from time to time in the manner provided by the Act. The registered agent of the Partnership in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by the Act.

(b) The principal place of business of the Partnership shall be3811 N. Bridge, Brady, Texas 76825, or at such other location designated by the General Partner.

**Section 1.5. Foreign Qualification**. Prior to the Partnership's conducting business in any jurisdiction other than Texas, the Partnership shall comply, to the extent procedures are reasonably available, with all requirements necessary to qualify the Partnership as a foreign limited partnership in such jurisdiction. At the request of the General Partner, each Partner agrees to execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Partnership as a foreign limited partnership in all such

-2-

jurisdictions in which the Partnership may conduct business.

**Section 1.6. Term.** The Partnership commenced on the date the Certificate was filed with the Secretary of State of Texas and shall continue in existence until it is dissolved and terminated in accordance with the terms hereof.

## ARTICLE II

### Definitions and References

**Section 2. 1.** **Definitions**. In addition to the terms defined elsewhere herein, when used in this Agreement, the following terms shall have the respective meanings assigned to them in this Section 2.1 or in the sections or other subdivisions referred to below:

**"Adjusted Capital Account"** shall mean the capital account maintained for each Partner as provided in Section 7.4, (a) increased by (i) the amount of any unpaid Capital Contributions agreed to be contributed by such Partner under Article IV, if any, and (ii) an amount equal to such Partner's allocable share of Minimum Gain as computed on the last day of such fiscal year in accordance with the applicable Treasury Regulations, and (b) decreased by the adjustments provided for in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4)-(6).

**"Affiliate"** shall mean, when used with respect to a Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, the terms **"controlling, controlled by or under common control"** shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

**"Agreement"** shall mean this Agreement of Limited Partnership, as hereafter amended, modified or changed in accordance with the terms hereof.

**"Capital Contribution"** shall mean, for any Partner at the particular time in question, the aggregate of the dollar amounts of any cash contributed to the capital of the Partnership and the fair market value of any property contributed to the capital of the Partnership, or, if the context in which such term is used so indicates, the dollar amounts of cash and the fair market value of any property agreed to be contributed, or requested to be contributed, by such Partner to the capital of the Partnership.

**"Certificate"** shall mean the Certificate of Limited Partnership filed by the Partnership with the Texas Secretary of State, as amended or restated from time to time.

**"Dispose"** (including the correlative terms **"Disposed"** or **"Disposition"**) shall

-3-

mean any sale, assignment, transfer, exchange, conveyance, gift, pledge, mortgage, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law.

**"General Partner"** shall mean Brady Plant Operators, L.L.C., a Texas limited liability company, and any Person or entity who becomes a substituted General Partner pursuant to the terms hereof.

**"Guaranty Obligations"** shall mean the obligations of Heartland, or its affiliates or partners, to guarantee the Working Capital Loan (as hereinafter defined).

**"Internal Revenue Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

**"Liquidation Amount"** shall have the meaning assigned to such term in Section 5.2.

**"Limited Partners"** shall mean Heartland, J Bar T, Huntland Properties, Huntland Resources, Window and any Person or entity who becomes an additional or substituted Limited Partner pursuant to the terms hereof.

**"Managers", "Board of Directors" "Board" or "Directors"** shall mean the Managers, or other governing body of the General Partner.

**"Minimum Gain"** shall have the meaning assigned to that term in Treasury Regulation section 1.704-2(d) and section 1.704-2(i)(3), as applicable.

**"Partner"** shall mean the General Partner or a Limited Partner, but such term does not include any Person who has ceased to be a Partner.

**"Partner Nonrecourse Debt"** shall have the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation section 1.704.2(b)(4).

**"Partner Nonrecourse Deductions"** shall have the meaning assigned to the term "partner nonrecourse deductions" in Treasury Regulation section 1.704-2(i).

**"Partnership Nonrecourse Liabilities"** shall have the meaning assigned to the term "nonrecourse liabilities" in Treasury Regulation section 1.752-1(a)(2).

**"Person"** shall have the meaning assigned to it in Section 1.02 of the Act.

**"Property"** shall mean all those certain assets purchased from Sellers pursuant to that certain Asset Purchase Agreement dated November 18, 2004 between Huntland Resources and Sellers.

**"Purchase Loans"** shall mean the promissory notes, security agreements, and other documents related to the loan from HRI as administrative agent for Sellers, to the Partnership as a part of the purchase price for the Property.

**"Treasury Regulations"** (or any abbreviation thereof used herein) shall mean temporary or final regulations promulgated under the Internal Revenue Code.

**"Unit Sharing Percentage"** shall mean as to any Partner, the percentage obtained by dividing the number of Units owned by such Partner by the total number of Units issued and outstanding at the time in question, subject to the provisions of Section 3.3.

**"Working Capital Loan"** shall mean the Loan Agreement, promissory notes, security agreements, guaranty agreements and other documents related to the loan from Community National Bank to the Partnership to fund the working capital needed for operations.

### Section 2.2.   References and Construction.

(a)    All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.

(b)    Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

(c)    The words "this Agreement", "this instrument", "herein", "hereof", "hereby","hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

(d)    Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(e)    Examples shall not be construed to limit, expressly or by implication, the matter they illustrate.

(f)    The word "or" is not exclusive and the word "includes" and its derivatives shall mean "includes, but is not limited to" and corresponding derivative expressions.

(g)    No consideration shall be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement.

(h)    All references herein to "$" or "dollars" shall refer to U.S. Dollars.

-5-

Unless the context otherwise requires or unless otherwise provided herein, the terms defined in this Agreement which refer to a particular agreement, instrument or document shall also refer to and include all renewals, extensions, modifications, amendments or restatements of such agreement, instrument or document, provided that nothing contained in this subsection shall be construed to authorize such renewal, extension, modification, amendment or restatement.

Each Exhibit attached hereto is incorporated herein by reference and made a part hereof for all purposes and references to this Agreement shall also include such Exhibit unless the context in which used shall otherwise require.

## ARTICLE III

## Partners and Units

**Section 3.1 Partners.** The Partners of the Partnership are set forth in Exhibit 3.1.

**Section 3.2. Units.**

(a) The Partnership shall have one class of Partnership interests consisting of 100,000 authorized common Partnership interests, which shall be referred to herein as "Units".

(b) Initially, as specifically set forth on Schedule 3.2(c), in consideration of the Capital Contributions made by the Partners, the Partnership shall issue 100 Units to General Partner, 3,000 Units to Huntland Resources, 900 Units to Huntland Properties, 4,500 Units to Heartland, 500 Units to Window and 1,000 Units to J Bar T.

(c) Exhibit 3.2(c) sets forth the number of Units owned by each Partner after giving effect to the transactions contemplated by subsection (b) above.

(d) Ownership of Units shall be evidenced by certificates (in this Section, **"Unit Certificates"**). Unit Certificates representing Units shall be in the form of Exhibit 3.2(d). The Partnership shall issue one or more Unit Certificates to each Partner, which Unit Certificates need not bear a seal of the Partnership, but shall be signed by an officer of the General Partner or other Person authorized to sign such Unit Certificates by the General Partner certifying the number and series of Units represented by such certificate. The Unit Certificates shall be consecutively numbered and shall be entered in the books of the Partnership as they are issued and shall exhibit the holder's name and number of Units. The General Partner may determine the conditions upon which a new Unit Certificate may be issued in place of a Unit Certificate that is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such Unit Certificate or its legal representative to give bond, with sufficient surety, to indemnify the Partnership and each

-6-

transfer agent and registrar against any and all losses or claims that may arise by reason of the issuance of a new Unit Certificate in the place of the one so lost, stolen or destroyed. Each Unit Certificate shall bear a legend on the reverse side thereof substantially in the following form:

> **THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE PARTNERSHIP SHALL HAVE BEEN DELIVERED TO THE PARTNERSHIP TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT). THIS SECURITY IS SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE AGREEMENT OF LIMITED PARTNERSHIP OF THE PARTNERSHIP, DATED AS OF NOVEMBER __, 2004 (AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE PARTNERSHIP AT ITS PRINCIPAL EXECUTIVE OFFICES.**

**Section 3.3  Heartland's Additional Units.**  While the Partnership is initially issuing 45% of the Partnership Units to Heartland in exchange for its Capital Contribution, the Partners acknowledge that Heartland, by and through its partners, is guaranteeing the Working Capital Loan.  In consideration for its Guaranty Obligations, Heartland shall be entitled to receive additional Partnership Units based on the length of time the guarantees are outstanding. The method for determining the additional Units to be issued is set forth below, with these amounts reflected in the schedule attached as Exhibit 3.3.

(a)  If Heartland is removed from its Guaranty Obligations on or before six (6) months following execution of the documents related to the Working Capital Loan, Heartland shall be issued  an additional  1,110 Units of the Partnership, bringing its Partnership Sharing Ratio to 50.5%, with such Additional Units to be issued effective as of the execution of the Guaranty Obligations; and

(b) If Heartland is removed from its Guaranty Obligations after six (6) months but on or before twelve (12) months following execution of the documents related to the Working Capital Loan, Heartland shall be issued  an additional 1,390 Units of the Partnership, with such Additional Units to be issued effective as of the beginning of the seventh month following execution of the Guaranty Obligations,  bringing its Partnership Sharing Ratio to 56%; and

(c) If Heartland is removed from its Guaranty Obligations after twelve (12) months
following execution of the documents related to the Working Capital Loan, Heartland shall
be issued an additional 1,785 Units of the Partnership, with such Additional Units to be
issued effective as of the beginning of the thirteenth month following execution of the
Guaranty Obligations, bringing its Partnership Sharing Ratio to 61.5%.

**Section 3.4. Additional Partners.**  Additional Persons may be admitted to the
Partnership as Partners as provided more specifically herein.

**Section 3.5. Withdrawal of General Partner.**  The General Partner shall not have
the right to withdraw, resign or retire from the Partnership, except as provided in Section
6.4.

## ARTICLE IV

## Capital Contributions

**Section 4.1. Initial Capital Contributions.**  The initial capital to be contributed by
each Partner is set forth in Section 3.2 hereof.

**Section 4.2  Additional Capital Contributions.** The Partners shall not be required
to make any additional capital contributions. The Limited Partners and the General Partner
may make, but shall not be obligated to make, such additional cash or non-cash
contributions as approved by the General Partner. In the event such additional capital
contributions are approved by the General Partner, each Partner shall have the right to
make such additional capital contributions sufficient to maintain the Partners' Unit Sharing
Percentages in the same proportions as prior to the additional capital contribution.  At the
time of any additional contributions, the fair market value of any non-cash contributions
shall be determined by the General Partner, and the Unit Sharing Percentages shall be
adjusted as  determined by the General Partner to take into account such additional
contributions.

**Section 4.3 Interest on Capital Accounts.**  No Partner shall receive any interest
on his or her capital contributions to the Partnership.

## ARTICLE V

## Allocations and Distributions

### Section 5.I.  Allocations.

(a)  Except as otherwise provided in  Section 5.2 or as may be required by
section 704(c) of the Internal Revenue Code and Treasury Regulation Section 1.704-

-8-

1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Partnership shall be allocated among the Partners in proportion to their Unit Sharing Percentages.

(b)    Notwithstanding any of the foregoing provisions of this Section 5.1 to the contrary:

(i)    If during any fiscal year of the Partnership there is a net increase in Minimum Gain attributable to a Partner Nonrecourse Debt that gives rise to Partner Nonrecourse Deductions, each Partner bearing the economic risk of loss for such Partner Nonrecourse Debt shall be allocated items of Partnership deductions and losses for such year (consisting first of cost recovery or depreciation deductions with respect to property that is subject to such Partner Nonrecourse Debt and then, if necessary, a pro rata portion of the Partnership's other items of deductions and losses, with any remainder being treated as an increase in Minimum Gain attributable to Partner Nonrecourse Debt in the subsequent year) equal to such Partner's share of Partner Nonrecourse Deductions, as determined in accordance with applicable Treasury Regulations.

(ii)    If for any fiscal year of the Partnership there is a net decrease in Minimum Gain attributable to Partnership Nonrecourse Liabilities, each Partner shall be allocated items of Partnership income and gain for such year (consisting first of gain recognized from the disposition of Partnership property subject to one or more Partnership Nonrecourse Liabilities and then, if necessary, a pro rata portion of the Partnership's other items of income and gain, and then, if necessary, for subsequent years) equal, to such Partner's share of such net decrease (except to the extent such Partner's share of such net decrease is caused by a change in debt structure with such Partner commencing to bear the economic risk of loss as to all or part of any Partnership Nonrecourse Liability or by such Partner contributing capital to the Partnership that the Partnership uses to repay a Partnership Nonrecourse Liability), as determined in accordance with applicable Treasury Regulations.

(iii)    If for any fiscal year of the Partnership there is a net decrease in Minimum Gain attributable to a Partner Nonrecourse Debt, each Partner bearing the economic risk of loss for such Partner Nonrecourse Debt shall be allocated items of Partnership income and gain for such year (consisting first of gain recognized from the disposition of Partnership property subject to Partner Nonrecourse Debt, and then, if necessary, a pro rata portion of the Partnership's other items of income and gain, and if necessary, for subsequent years) equal to such Partner's share of such net decrease (except to the extent such Partner's share of such net decrease is caused by a change in debt structure or by the Partnership's use of capital contributed by such Partner to repay the Partner Nonrecourse Debt) as determined in accordance with applicable Treasury Regulations.

(c)    The losses and deductions allocated pursuant to this Article V shall not exceed the maximum amount of losses and deductions that can be allocated to a Partner

-9-

without causing or increasing a deficit balance in the Partner's Adjusted Capital Account. If, at the end of any fiscal year, as a result of the allocations otherwise provided for in this Section 5. 1. the Adjusted Capital Account balance of any Partner shall become negative, items of deduction and loss otherwise allocable to such Partner for such year, to the extent such items would have caused such negative balance, shall instead be allocated to Partners having positive Adjusted Capital Account balances remaining at such time in proportion to such balances.

(d)     If a Partner unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations section 1.704-1(b)(2)(ii)(d)(4)-(6) that causes or increases a deficit balance in such Partner's Adjusted Capital Account, items of Partnership income and gain shall be allocated to that Partner in an amount and manner sufficient to eliminate the deficit balance as quickly as possible.

(e)     The allocations set forth in subsections (b), (c) (last sentence), and (d) (collectively, the **"Regulatory Allocations"**) are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations that are made be offset either with other Regulatory Allocations or with special allocations pursuant to this Section 5.1(e). Therefore, notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Adjusted Capital Account balance is, to the extent possible, equal to the Adjusted Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to the remaining sections of this Article V.

(f)     In accordance with Section 704(c) of the Internal Revenue Code and the Treasury Regulations thereunder, income and deductions with respect to any property carried on the books of the Partnership at an amount that differs from such property's adjusted tax basis shall, solely for federal income tax purposes, be allocated among the Partners in a manner to take into account any variation between the adjusted tax basis of such property to the Partnership and such book value. In making such allocations, the General Partner shall use such method of curative allocations as it may select pursuant to Treasury Regulations Section 1-704-3.

(g)     All items of income, gain, loss, deduction and credit allocable to any Units that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning those Units, without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under section 706 of the Internal Revenue Code and the applicable Treasury Regulations.

**Section 5.2. Special Allocations.** There shall be no special allocations.

-10-

**Section 5.3. Distributions in Respect of the Units.**

(a)     The Partnership may make distributions of cash or other properties to the Partners in respect of the Units from time to time as determined by the General Partner in accordance with the terms hereof.

(b)     Each Partner shall be entitled to receive a share of each distribution made to the Partners under this Section 5.3 determined as follows:

(i)     first, to the Partners in proportion and to the extent necessary to cause the cumulative distributions to them pursuant to Section 5.4 and this Section 5.3(b)(i) to be in accordance with their respective Unit Sharing Percentages; and

(ii)     thereafter, to the Partners in accordance with their respective Unit Sharing Percentages.

**Section 5.4. Tax Distributions.** Notwithstanding Section 5.2 and 5.3, as soon as conveniently possible after the end of each taxable period of the Partnership (but in no event sooner than the time the Partnership's accountants have determined the Partnership's income, gains, deductions, losses and credits for such taxable period with reasonable accuracy) cash distributions shall be made to the Partners in proportion to and to the extent of their respective Presumed Partnership Tax Liabilities to the extent sufficient cash reserves are available, as determined by the General Partner. For purposes of this Section 5.4, "Presumed Partnership Tax Liability" shall, as to each Partner for any given taxable period of the Partnership, be deemed to be equal to the product of (a) the excess, if any, of (i) the amount of the income and gain items reported or reportable on such Partner's Schedules K-1 (IRS Form 1065) with respect to the Units of the Partnership for such taxable period over (ii) the sum of the deduction and loss items reported or reportable on such Schedules K-1 for such taxable period and (b) the maximum effective federal individual income tax rate (as determined by the Partnership's accountants).

**Section 5.5. Payment of Cash Distributions.** Unless waived in writing by a Partner, payment of all cash distributions to the Partners under this Agreement shall be made by check.

### ARTICLE VI

### Management/Governance Provisions; Liability, Limitations and Activities of Limited Partners

**Section 6.1. Power and Authority of the General Partner.** Subject to the terms hereof, the General Partner shall have the sole and exclusive power and authority to manage the business of the Partnership and shall have all of the rights and powers which may be possessed by general partners under the Act, including, without limitation, the right and power to:

(a)     acquire by purchase, lease or otherwise any property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

(b)     operate, maintain, finance, improve, own, sell, convey, assign, mortgage and lease any property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

(c)     make and execute any and all agreements, contracts, promissory notes, loan agreements, security agreements, financing statements, collateral pledges, trust deeds, mortgages, deeds, easements, affidavits, leases, assignments, bills of sale, contracts, certifications, and other instruments necessary or convenient in connection with the acquisition, disposition, encumbrance, development, management, maintenance, and operation of any Partnership property, or in connection with managing the affairs of the Partnership, including executing amendments to this Agreement and the Certificate in accordance with the terms of this Agreement, pursuant to any power of attorney granted by the Limited Partners to the General Partner;

(d)     borrow money from third parties, the General Partner or any Limited Partner and issue evidences of indebtedness necessary, convenient or incidental to the accomplishment of the purposes of the Partnership, and secure the same by mortgage, pledge, or other lien on any Partnership property;

(e)     prepay in whole or in part, refinance, increase, modify or extend any liabilities affecting Partnership property and in connection therewith execute any extensions or renewals of encumbrances on any Partnership property;

(f)     care for and distribute funds to the Partners by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Partnership and this Agreement;

(g)     contract on behalf of the Partnership for the employment and services of employees and/or independent contractors (which may include any Partner or an Affiliate of any Partner), such as managers, advisors, lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Partnership;

(h)     engage in any kind of activity and perform and carry out contracts of any kind necessary or incidental to, or in connection with, the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified;

(i)     take, or refrain from taking, all actions not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Partnership;

-12-

(j)    institute, prosecute, defend, settle, compromise and dismiss lawsuits or other judicial or administrative proceedings brought by or on behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

**Section 6.2    Right to Rely on General Partner**. Any Person dealing with the Partnership may rely (without duty of further inquiry) upon a certificate signed by the General Partner as to:

(a)    the identity of the General Partner;

(b)    the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by a General Partner; or

(c)    the Persons who are authorized to execute and deliver any instrument or document of the Partnership.

The signature of an executive officer or other comparable representative of the General Partner shall be necessary and sufficient to convey title to any property owned by the Partnership or to execute any promissory notes, loan agreements, security agreements, financing statements, collateral pledges, trust deeds, mortgages, deeds, easements, contracts, certificates, affidavits, leases, assignments or other instruments of any kind.

**Section 6.3    Management fee.**    The Partnership shall pay to Terry McIver, for serving as the President of the General Partner, as a guaranteed payment pursuant to Section 707 of the Internal Revenue Code, a management fee in an amount set forth in an employment agreement to be agreed upon by the Partnership and a majority of the Board of Directors of the General Partner, subject to annual review by the Board of Directors.

**Section 6.4  Duties and Obligations of General Partner.**

(a)    The General Partner shall take all actions which may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Texas (and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged), (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation, and operation of any Partnership property in accordance with the provisions of this Agreement and applicable laws and regulations (iii) to comply in all material respects with the terms and provisions of all agreements to which the Partnership is a party or to which its properties are subject, (iv) to comply in all material respects with all applicable laws to which the Partnership is subject (including all applicable federal, state and local environmental laws), and (v) to obtain and maintain all licenses, permits, franchises, and other governmental authorizations required to be obtained and maintained

-13-

by the Partnership with respect to the ownership of Partnership properties and the conduct of Partnership business and operations.

(b)     The General Partner shall be under a fiduciary duty to conduct the affairs of the Partnership in the best interests of the Partnership and of the Limited Partners, including the safekeeping and use of all Partnership property and the use thereof for the exclusive benefit of the Partnership.

**Section 6.5   Liability of Limited Partners.** No Limited Partner shall be liable for the debts, liabilities, contracts or other obligations of the Partnership except (a) to the extent of any unpaid Capital Contributions agreed to be made by such Limited Partner to the Partnership, (b) to the extent of such Limited Partner's share of the assets (including undistributed revenues) of the Partnership and (c) except as otherwise provided in the Act.

**Section 6.6   Limitations on Limited Partners.** Except as otherwise expressly provided herein, no Limited Partner, in its capacity as a limited partner of the Partnership, shall: (a) be permitted to take part in the business or control of the business or affairs of the Partnership; (b) have any voice in the management or operation of any Partnership property; or (c) have the authority or power to act as agent for or on behalf of the Partnership or any other Partner, to do any act which would be binding on the Partnership or any other Partner, or to incur any expenditures on behalf of or with respect to the Partnership; provided, that the foregoing shall not preclude the Affiliates or designees of a Limited Partner from serving on the Board of Directors of the General Partner and exercising any and all rights accorded to a Director of the General Partner by law, this Agreement and the articles of incorporation and bylaws of the General Partner.

**Section 6.7.Certain Agreements Regarding the Board of Directors of General Partner.**

(a)     From and after the date hereof, the Board of Directors(or other governing body) of the General Partner shall be composed of five (5) individuals. Heartland shall have the right to designate three individuals to serve on the Board of Directors. Huntland Resources and Huntland Properties (jointly) shall have the right to designate two individuals to serve on the Board of Directors. The initial designees to the Board, as prescribed by the foregoing provisions of this subsection (a), are set forth in Exhibit 6.7. Immediately after the execution and delivery of this Agreement by the parties hereto, the Board of Directors of the General Partner shall be composed of such designees, each of whom shall serve until his successor is duly selected and qualified or until such individual's death, resignation or removal.

(b)     Directors will not be paid any fee for serving as Directors  but will be entitled to reimbursement for reasonable out-of-pocket expenses in attending meetings of the Board.

-14-

**Section 6.8. Removal of Directors.** Any Director may be removed as a Director at any time and from time to time, with or without cause, by the Partner who designated such Director to serve on the Board. Except as provided in the immediately preceding sentence, a Director may not be removed.

**Section 6.9. Vacancies.** If a vacancy is created on the Board of Directors at any time by the death, disability, retirement, resignation or removal of a Director, the Partner that had designated such Director to serve as a Director shall have the sole and exclusive right to designate a replacement therefor.

**Section 6.10. Meetings of Board of Directors.** Regular meetings of the Board of which no notice shall be necessary, shall be held quarterly at such times and places as may be fixed from time to time by resolution adopted by the Board and communicated to all Directors. Except as otherwise provided by statute, the Certificate or this Agreement, any and all business may be transacted at any regular meeting.

**Section 6.11. Removal of General Partner.** The General Partner may be removed as a General Partner of the Partnership upon a Majority in Interest vote of Limited Partners. In such event, written notice of the removal of a General Partner shall be served upon it either by certified or registered mail, return receipt requested, or by personal service. Such notice shall set forth the date upon which the removal is to become effective. The Limited Partners holding a Majority in Interest may elect to continue the Partnership and select another person or entity as a substitute general partner at a special meeting of Limited Partners called for such purpose.

## ARTICLE VII

### Accounting and Banking Matters; Capital Accounts; Tax Matters

**Section 7.l. Books and Records.** The Partnership shall keep and maintain full and accurate books of account for the Partnership in accordance with generally accepted accounting principles consistently applied in accordance with the terms of this Agreement. Such books shall be maintained at the principal United States office of the Partnership.

**Section 7.2. Fiscal Year.** The calendar year shall be selected as the accounting year of the Partnership and the books of account shall be maintained on an accrual basis.

**Section 7.3. Bank Accounts.** The Partnership shall maintain one or more bank accounts in the name of the Partnership in such bank or banks as may be determined by the General Partner, which accounts shall be used for the payment of expenditures incurred by the Partnership in connection with the business of the Partnership and in which shall be deposited any and all receipts of the Partnership. All such receipts shall be and remain the property of the Partnership and shall not be commingled in any way with funds of any other Person.

-15-

**Section 7.4. Capital Accounts.**

(a)     A capital account shall be established and maintained for each Partner.
Each Partner's capital account (a) shall be increased by (i) the amount of money
contributed by that Partner to the Partnership, (ii) the fair market value of property
contributed by that Partner to the Partnership (net of liabilities secured by the contributed
property that the Partnership is considered to assume or take subject to under section 752
of the Internal Revenue Code), and (iii) the amount of any item of taxable income or gain
and the amount of any item of income and gain exempt from tax allocated to such Partner
for federal income tax purposes, and (b) shall be decreased by (i) the amount of money
distributed to that Partner of the Company, (ii) the fair market value of property distributed
to that Partner by the Partnership (net of liabilities secured by the distributed property that
the Partner is considered to assume or take subject to under section 752 of the Internal
Revenue Code), (iii) allocations to that Partner of expenditures of the Partnership
described in section 705(a)(2)(B) of the Code, and (iv) allocations to that Partner of
Partnership loss and deduction (or items thereof). The Partners' capital accounts also shall
be maintained and adjusted as permitted by the provisions of Treasury Regulation sections
1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation sections
1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the
Partners of depreciation, depletion, amortization, and gain or loss as computed for book
purposes rather than the allocation of the corresponding items as computed for tax
purposes, as required by Treasury Regulation section 1.704-1(b)(2)(iv)(g).

(b)     Notwithstanding the foregoing provisions of this Section 7.4, the Partners'
capital accounts shall be adjusted on the date of this Agreement in the manner required
under Treasury Regulation § 1.704-1(b)(2)(iv)(f) to reflect the fair market value of the
Partnership's assets immediately prior to the date of this Agreement, which value shall be
determined by reference to the Capital Contributions made to the Partnership for additional
Units under Sections 4.2 and 4.3. Thereafter, the Partners' capital accounts shall be
maintained and adjusted as permitted by the provisions of Treasury Regulation §§ 1.704-
1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Partners
of depreciation, depletion, amortization and gain or loss as computed for book purposes
rather than the allocation of the corresponding items as computed for tax purposes, as
required by Treasury Regulation § 1.704-1(b)(2)(iv)(g).

(c)     On the Disposition of all or part of a Partner's Units, the capital account of the
transferor that is attributable to the transferred Units shall carry over to the transferee
Partner in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(1).

**Section 7.5. Tax Partnership.** The Partners agree to classify the Partnership as
a partnership for federal tax purposes. Neither the Partnership, the General Partner, any
Partner nor any officer or other representative of any of the foregoing shall file an election
to classify the Partnership as an association taxable as a corporation for federal tax
purposes.

**Section 7.6. Tax Elections**. The Partnership shall make the following elections:

(a)     To elect the calendar year as the Partnership's fiscal year if permitted by applicable law;

(b)To elect with respect to such other federal, state and local tax matters as the General Partner shall approve, as the best interests of the partners.

**Section 7.7. Tax Matters Partner**. The General Partner shall from time to time designate a Partner (which may be the General Partner) to act as the "tax matters partner" under Section 6231 of the Internal Revenue Code subject to replacement by the General Partner (such Partner, in this Section, being called the **"tax matters partner"**). The tax matters partner shall promptly notify the Partners if any tax return or report of the Partnership is audited or if any adjustments are proposed by any governmental body. In addition, the tax matters partner shall promptly furnish to the Partners all notices concerning administrative or judicial proceedings relating to federal income tax matters as required under the Internal Revenue Code.     During the pendency of any such administrative or judicial proceeding, the tax matters partner shall furnish to the Partners periodic reports, not less often than monthly, concerning the status of any such proceeding. Without the unanimous consent of the Directors, the tax matters partner shall not extend the statute of limitations, file a request for administrative adjustment, file suit concerning any tax refund or deficiency relating to any Partnership administrative adjustment or enter into any settlement agreement relating to any Partnership item of income, gain, loss, deduction or credit for any fiscal year of the Partnership.

## ARTICLE VIII

### Indemnification

**Section 8. 1.     Indemnification.**     To the fullest extent permitted by law, and subject to the procedures in Article 11 of the Act, on request by the Person indemnified the Partnership shall indemnify each General Partner, each Limited Partner, and the respective Affiliates, officers, directors, partners, members, managers, employees, and agents of each of the foregoing and hold them harmless from and against all losses, costs, liabilities, damages, claims, and expenses (including, without limitation, costs of suit and attorney's fees) any of them may incur as a General Partner (or as an Affiliate, officer, director, partner, member, manager, employee or agent thereof) in performing the obligations of that General Partner with respect to the Partnership, or as a Limited Partner arising out of its status as such (or as an Affiliate, officer, director, partner, member , manager, employee or agent thereof) in connection with the Partnership, SPECIFICALLY INCLUDING THE PERSON INDEMNIFIED'S SOLE, PARTIAL, OR CONCURRENT NEGLIGENCE, and on request by the Person indemnified the Partnership shall advance expenses associated with defense of any related action; provided, however, that this indemnity does not apply to actions constituting gross negligence, willful misconduct, an intentional violation of

-17-

applicable securities laws or material breach of this Agreement by the indemnified Person. The satisfaction of any defense or indemnification and any saving harmless shall be solely from the Partnership assets (which shall be converted to cash to the extent necessary in a manner appropriate to protect the interests of all Partners). To the extent such Partnership assets are less than the Partnership's obligations under this Section 8.1 (such difference being referred to herein as the **"Shortfall Amount"**), no Partner shall be required to make a Capital Contribution, loan, advance or other payment to fund such Shortfall Amount.

### ARTICLE IX
### Dispositions of Units

#### Section 9.l. Dispositions.

(a)    Except as specifically permitted in this Article IX, no Partner shall Dispose of all or any portion of such Partner's Units (or any interest therein) without the prior written consent of all Partners, which consent may be withheld for any reason or for no reason.

(b)    Notwithstanding the terms of Section 9.1(a) to the contrary:

(i)    any Partner who is an individual may assign all or part of his Units during his lifetime or upon his death pursuant to his will or by intestate succession, for value, as a gift or otherwise, to (A) such Partner's spouse, children (including adopted and step-children), grandchildren, sisters, brothers, father, mother, father-in-law, mother-in-law, son-in-law or daughter-in-law or (B) an inter vivos trust or any other entity the majority of the beneficial interests in which are held exclusively, directly or indirectly, by the individual Partner or any Person described in the preceding clause (A), provided that in each instance the assignee agrees in writing to be bound by the provisions of this Agreement as if such assignee were an original signatory hereto.

(ii)    any Partner that is a corporation, partnership or other entity may assign all or part of its Units to any Affiliate of the assignor Partner of which the assignor Partner owns, directly or indirectly, 80% or more of the ownership interests and over which the assignor Partner has effective control, provided that in each instance the assignee agrees in writing to be bound by the provisions of this Agreement as if such assignee were an original signatory hereto.

(iii)    (intentionally left blank)

(iv)    (intentionally left blank)

(v)    Upon dissolution of any Limited Partner, the Units then held by such Limited Partner may be assigned to the partners of the Limited Partner, provided that the assignees agree in writing to be bound by the provisions of this Agreement as if such assignees were original signatories hereto.

-18-

(c)     Every Disposition shall be subject to all of the terms, conditions, restrictions and obligations set forth in this Agreement.

(d)     The transferee of an interest in the Partnership transferred pursuant to this Article IX that is admitted to the Partnership as a substitute Partner as provided in Section 9.5 hereof shall succeed to the rights and liabilities of the transferor Partner and, after the effective date of such admission, the Capital Contribution and Capital Account of the transferor shall become the Capital Contribution and Capital Account, respectively, of the transferee, to the extent of the interest transferred.

(e)     The admission of a transferee as a substitute Partner shall become effective on the date an amendment to reflect the transferred Units is duly recorded in the Partnership's records. Upon the admission of a substitute Partner, the appropriate Exhibits to this Agreement shall be amended to reflect, among other matters, the name and address of the substitute Partner.

(f)     Any attempted Disposition or withdrawal in contravention of any of the provisions of this Agreement shall be void ab initio and shall not bind or be recognized by the Partnership, the General Partner or the Partners.

(g)     Any costs incurred by the Partnership in connection with any Disposition by a Partner of all or a part of its Units shall be borne by such Partner.

(h)     Notwithstanding anything herein to the contrary, the terms and provisions of this Section 9. 1 shall not be deemed to be applicable to a sale of all of the outstanding Units pursuant to Section 9.4.

### Section 9.2 Right of First Refusal.

(a)     If a Partner (the **"Disposing Partner"**) desires to Dispose of all or any part of his Units (the **"Subject Units"**) by any means whatsoever (other than a Disposition described in Section 9.1(b) above or any merger, consolidation or other transaction that is permitted by Section 6.3(a)(xiv) hereof), then the Disposing Partner shall give written notice thereof (the **"Voluntary Transfer Notice"**) to the Partnership and to each holder of Units (the **"Eligible Partners"**), which notice shall set forth the proposed price (the **"Voluntary Transfer Price"**) and the terms of payment for the Subject Units (the **"Voluntary Transfer Terms"**). The Voluntary Transfer Notice shall constitute an offer by the Disposing Partner to the Partnership and the Eligible Partners to sell the Subject Units at the Voluntary Transfer Price and on the Voluntary Transfer Terms.

(b)     The Partnership shall have the right, exercisable within thirty (30) days after the receipt of the Voluntary Transfer Notice by sending written notice of acceptance to the Eligible Partners and to the Disposing Partner, to purchase all or any portion of the Subject Units. The Partnership's written acceptance shall establish a date, within ninety (90) days but not less than ten (10) days after receipt of the Voluntary Transfer Notice, for the closing of the purchase and sale of the Subject Units.

-19-

(c)     If the Partnership does not purchase all of the Subject Units pursuant to Section 9.2(b) above, then the Eligible Partners shall have the right, exercisable within sixty (60) days after the Partnership's receipt of the Voluntary Transfer Notice by sending written notice of acceptance to the Partnership and to the Disposing Partner, to purchase the remaining Subject Units. If more than one Eligible Partner desires to purchase the remaining Subject Units, then such Subject Units shall be purchased by them in such proportions as they may agree. In the absence of agreement, the remaining Subject Units shall be allocated to each Eligible Partner desiring to purchase them pro rata based on the number of Units held by such Eligible Partner. If one or more Eligible Partners elect to purchase Subject Units pursuant to this Section 9.2(c), then the closing shall be held on the date established by the Partnership pursuant to Section 9.2(b) above, or, if the Partnership has elected not to purchase any of the Subject Units, on a date established by the written agreement of the Disposing Partner and a majority (in number) of the Eligible Partners, which closing date shall be within ninety (90) days but not less than ten (10) days after the Partnership's receipt of the Voluntary Transfer Notice.

(d)     On the date of closing, the Disposing Partner shall sell, and the Partnership and/or the Eligible Partners shall purchase, the Subject Units subscribed for in Section 9.2(b) and Section 9.2(c) above, at the Voluntary Transfer Price and upon the Voluntary Transfer Terms. The closing shall be held at the principal office of the Partnership.

(e)     The Disposing Partner may Dispose of any Subject Units that are not purchased by the Partnership and/or the Eligible Partners pursuant to the provisions of this Section 9.2, but only for the Voluntary Transfer Price and upon the Voluntary Transfer Terms as set forth in the Voluntary Transfer Notice and only if the Disposing Partner first complies with the requirements of Section 9.3 below.

(f)     If any Units of a Partner shall be attached or levied upon by judicial process and such attachment or levy shall not be promptly removed and abated, or if a Partner shall attempt to Dispose of any of its Units without complying with the provisions of this Article IX, then such Partner shall be deemed to have given a **"Voluntary Transfer Notice"** to the Partnership and the Eligible Partners under Section 9.2(a) above covering all of such Partner's Units (which shall be **"Subject Units"** for purposes of this Section 9.2) at a time immediately prior in time to such attachment, levy or attempt to Dispose, which notice shall become effective at such time as the Partnership shall have actual notice of such attachment, levy or attempt to Dispose. Within thirty (30) days after the Partnership shall have actual notice of such attachment, levy or attempted Disposition, it shall cause written notice thereof to be sent to all Eligible Partners. The **"Voluntary Transfer Price"** for such Partner's Units shall be the amount paid by such Partner for such Units, and the terms of Section 9.2(a) through Section 9.2(d) above shall apply to all such Units.

-20-

## Section 9.3 Tag-Along Rights.

If, at any time, any Partner or group of Partners (individually or collectively, the **"Seller"**) proposes to enter into any transaction, or series of related transactions, involving the Disposition of Units (other than a Disposition described in Section 9.1(b) above or any merger, consolidation or other transaction that is permitted by Section 6.3(a)(xiv) hereof), then the Seller shall first comply with the provisions of Section 9.2 above. If all of the Units proposed to be Disposed are not acquired by the Partnership and/or the Eligible Partners pursuant to Section 9.2 above, then the Seller shall give to each Partner written notice (the **"Co-Sale Notice"**), at least fifteen (15) days in advance of the proposed Disposition or the date that such tender is required, of such Partner's opportunity to sell its Pro Rata Share (as defined below) of the total number of Units to be purchased by the proposed transferee (the **"Co-Sale Units"**), on the same terms and conditions (including price) applicable to the Co-Sale Units to be sold by the Seller (the Co-Sale Notice shall state the total number of Co-Sale Units to be purchased by the proposed transferee and shall describe in detail the other terms and conditions of the proposed Disposition). A Partner may exercise its right to participate in the proposed Disposition by giving written notice to the Seller within ten (10) days after such Partner's receipt of the Co-Sale Notice. A Partner's **"Pro Rata Share"** for purposes of this Section 9.3 means a fraction, the numerator of which is the number of Units held by such Partner at the time of the proposed Disposition, and the denominator of which is the total number of Units held by the Seller and the Partners at the time of the proposed Disposition.

All Dispositions under this Section 9.3 shall be subject to the provisions of Section 9.5 below.

## Section 9.4 Drag-Along Rights.

(a)    If at any time, the holders of more than forty percent (40%) of the outstanding Units (the **"Receiving Partners"**) have received a bona fide written cash offer from an unaffiliated purchaser or group of unaffiliated purchasers (the **"Offer"**) (x) to purchase all of the Partnership's outstanding Units or (y) to purchase all or substantially all of the Partnership's assets (other than by way of any merger, consolidation or similar transaction), the Receiving Partners shall have the right to (1) in the case of a transaction described in the immediately preceding clause (x), require each holder of Units to make an election to either sell all of its Units to such unaffiliated purchaser or group of purchasers on the same terms and conditions applicable to, and for the same purchase price payable to, the Receiving Partners, or reject the proposal, and (2) in the case of a transaction described in the immediately preceding clause (y), require each holder of Units to make an election to either approve and cause the Partnership to consummate such transaction or reject the proposal.

(b)    If the Receiving Partners desire to enter into any transaction, or series of related transactions, involving the sale of all or substantially all of the Partnership's assets or the sale of all of the Partnership's outstanding Units in a transaction described in

-21-

paragraph (a) of this Section 9.4, then the Receiving Partners may, but shall not be obligated to, give to all other Partners (the **"Electing Partners"**) a notice describing in detail all of the terms and conditions of the Offer (including a copy of the Offer) and stating that such notice is being delivered pursuant to this Section 9.4 (the **"Election Notice"**).

(c) Within thirty days after the last date on which each Electing Partner has received an Election Notice ( the **"Election Period"**), each Electing Partner shall deliver to the Receiving Partners its written election to either accept the Offer or reject the Offer. Failure to deliver an election within the Election Period shall be deemed to be a rejection of the Offer. If an Electing Partner rejects the offer (a **"Rejecting Partner"**), such Rejecting Partner shall then be obligated to purchase (upon the equivalent terms and conditions as set forth in the Offer) the Units of the Receiving Partners and any Electing Partner who has elected to accept the Offer for cash at a purchase price equal to 100% of the cash purchase price stated in the Offer, multiplied by the Unit Sharing Percentage of each such Receiving Partner and Electing Partner that has accepted the Offer. If there shall be more than one Rejecting Partner, the obligation to purchase the Units of the Receiving Partner and the Electing Partners who have accepted the Offer shall be borne pro rata among the Rejecting Partners, based on a fraction the numerator which is the number of Units owned by each Rejecting Partner and the denominator of which is the number of Units owned by all Rejecting Partners.

(d) If one or more Rejecting Partners are required to purchase Units pursuant to this Section 9.4, then the closing shall be held on the date established by the Receiving Partners, which closing date shall be within thirty days but not less than twenty days after the end of the Election Period.

(e) Each Partner hereby covenants and agrees to take such steps and execute such documents as may be necessary, appropriate or desirable to effectuate the provisions of this Section 9.4.

### Section 9.5. Substitution.

(a) Unless an assignee of Units becomes a Partner in accordance with the provisions set forth below, such assignee shall not be entitled to any of the rights granted to a Partner hereunder in respect of such Units, other than the right to receive allocations of income, gain, loss, deduction, credit and similar items and distributions to which the assignor would otherwise be entitled, to the extent such items are assigned.

(b) An assignee of the Units of a Partner, or any portion thereof, shall become a substitute Partner entitled to all of the rights of a Partner in respect of such Units if, and only if (i) the assignor gives the assignee such right, (ii) the other Partners consent to such substitution (which consent shall not be unreasonably withheld, conditioned or delayed) and (iii) the assignee executes and delivers such instruments, in form and substance reasonably satisfactory to the other Partners, as the other Partners may deem reasonably necessary to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

-22-

**Section 9.6.     Change in Control or Change of Key Personnel.**  The General
Partner may not cause or permit an interest, direct or indirect, in itself to be Disposed of
such that, after such Disposition, without the consent of the Limited Partners, in its sole
and absolute discretion, the General Partner shall cease to be controlled (more than 50%)
by substantially the same Persons who control it as of the date of this Agreement.

**Section 9.7  Death, Legal Incompetency, or Dissolution of Limited Partner.**
The death, legal incompetency, dissolution or other disability of a Limited Partner shall not
dissolve or terminate the Partnership.  Upon the death or legal incompetency of a Limited
Partner, the estate, personal representative, guardian or other successor in interest of such
Limited Partner shall have all the rights, shall be liable for all the Partnership liabilities of
such Limited Partner, and, with the prior written consent of the General Partner, may be
substituted for such Limited Partner.

## ARTICLE X

### Dissolution, Liquidation and Termination

**Section 10.1.          Dissolution.**  The Partnership shall dissolve and its affairs shall
be wound up on the first to occur of the following:

(a)     the fortieth (40th) anniversary of the date of this Agreement;

(b)     the sale or other disposition of all or substantially all of the assets of the
Partnership to any other Person in which the Partners do not own a majority of the
outstanding voting securities of such other Person, unless the Partners otherwise agree;

(c)     the merger or consolidation of the Partnership, the conversion of the
Partnership into another form of entity or the exchange of Partnership interests, in each
case with or into any other Person in which the Partners do not own a majority of the
outstanding voting securities of such other Person, unless the Partners shall otherwise
agree;

(d)     entry of a decree of judicial dissolution of the Partnership under Section 8.01
of the Act; or

**Section 10.2.          Liquidation and Termination.**     On dissolution of the
Partnership, the liquidator shall be a Person selected by the General Partner.   The
liquidator shall proceed diligently to wind up the affairs of the Partnership and make final
distributions as provided herein and in the Act.  The costs of liquidation shall be borne as
a Partnership expense.  Until final distribution, the liquidator shall continue to manage the
Partnership with all of the power and authority of the General Partner.  The steps to be
accomplished by the liquidator are as follows:

ᴗ

(a)    As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Partnership's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)    The liquidator shall pay, satisfy or discharge from Partnership funds all of the debts, liabilities and obligations of the Partnership (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).

(c)    All remaining assets of the Partnership shall be distributed to the Partners as follows:

(i)    the liquidator may sell any or all Partnership property and any resulting gain or loss from each sale shall be computed and allocated to the capital accounts of the Partners as provided in Section 5.1;

(ii)    with respect to all Partnership property that has not been sold, the fair market value of that property shall be determined and the capital accounts of the Partners shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the capital accounts previously would be allocated among the Partners under Section 5.1 if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)    Partnership property shall be distributed among the Partners in the amounts specified in Sections 5.2 and 5.3.

All distributions in kind to the Partners shall be valued for purposes of determining each Partner's interest therein at its fair market value at the time of such distribution, and such distributions shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Partnership has committed prior to the date of termination, and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 10.2. It is intended that the foregoing distributions to each Partner will be equal to each Partner's respective positive capital account balance as determined after giving effect to the foregoing adjustments and to all adjustments attributable to allocations of items of income, gain, loss and deduction realized by the Partnership during the taxable year in question and all adjustments attributable to contributions and distributions of money and property effected prior to such distribution. To the extent that any such Partner's positive capital account balance does not correspond to such distribution, the allocations provided for in Section 5.1 shall be adjusted, to the least extent necessary, to produce a capital account balance for the Partner which corresponds to the amount of such distribution. Any distribution to the Partners in liquidation of the Partnership shall be made by the later of the end of the taxable year in

-24-

which the liquidation occurs or 90 days after the date of such liquidation. For purposes of the preceding sentence, the term "liquidation" shall have the same meaning as set forth in Treasury Regulation § 1.704-l(b)(2)(ii). The distribution of cash and/or property to a Partner in accordance with the provisions of this Section 10.2 constitutes a complete return to the Partner of its Capital Contribution and a complete distribution to the Partner of its Units and all the Partnership's property and constitutes a compromise to which all Partners have consented within the meaning of Section 5.02 of the Act. To the extent that a Partner returns funds to the Partnership, it has no claim against any other Partner for those funds.

**Section 10.3 Deficit Capital Accounts**. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, no Partner shall be obligated to restore a deficit balance in such Partner's capital account at any time.

**Section 10.4 Certificate of Cancellation**. On completion of the distribution of Partnership assets as provided herein, the Partnership shall be terminated and the Partners shall file a certificate of cancellation with the Secretary of State of Texas, cancel any other filings made pursuant to Section 1.5, and take such other actions as may be necessary to terminate the Partnership.

## ARTICLE XI

### Representations and Warranties

**Section 11.1. Representations and Warranties of Partners to Each Other**. Each Partner hereby severally (and not jointly or jointly and severally) as to itself only represents and warrants to the other Partners as follows:

(a) Such Partner (if not an individual) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b) Such Partner, if an individual, is not a minor and has the requisite legal capacity to execute and deliver this Agreement and to perform his or her obligations hereunder.

(c) Such Partner has the requisite power and authority to execute and deliver this Agreement and to perform such Partner's obligations hereunder.

(d) The execution, delivery and performance by such Partner (if not an individual) of this Agreement has been duly and validly authorized by all requisite limited liability company, partnership or corporate (as applicable) action.

(e) The execution, delivery and performance by such Partner of this Agreement (i) (if not an individual) is within its limited liability, partnership or corporate (as applicable) powers and (ii) will not (A) be in contravention of or violate any provisions of its charter or other governing documents, as amended to the date hereof in the instance of a Partner

-25-

not an individual), or (B) be in contravention of or result in any breach or constitute a default under any applicable law, rule, regulation, judgment, license, permit or order or any loan, note or other agreement or instrument to which such Partner is a party or by which it or any of its properties are bound.

(f) When delivered to the other Partners, this Agreement will have been duly and validly executed and will be binding upon such Partner and enforceable in accordance with the terms hereof.

(g) No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Partner of this Agreement.

(h) Such Partner nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein; and such Partner shall indemnify and hold harmless the Partnership and the other Partners from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by such Partner in connection with the Partnership or this Agreement.

(i) Such Partner is not in default or breach of any agreement to which such Partner is a party or by which its properties are bound.

(j) There is no pending or, to such Partner's knowledge (after due inquiry), threatened judicial, administrative or arbitral action, suit or proceeding against or investigation of such Partner or its ability to perform its obligations under this Agreement.

**Section 11.2. Survival of Representations and Warranties.** All representations, warranties and covenants made by each of the Partners in this Agreement or any other document contemplated thereby or hereby shall be considered to have been relied upon by the other party hereto and shall survive the execution and delivery of this Agreement or such other document, regardless of any investigation made by or on behalf of any such party.

## ARTICLE XII

### General Provisions

**Section 12.l.** **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the

-26-

United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests and consents to be sent to a Partner must be sent to or made at the addresses given for that Partner on Exhibit 3.2(c) or such other address as that Partner may specify by notice to the other Partners. All notices, requests and consents to be sent to the Partnership must be sent to or made at the address of the Partnership's principal place of business as the Partnership may specify by notice to the Partners.

**Section 12.2.** **Amendment or Modification.** This Agreement may be amended or modified from time to time only by a written instrument executed and agreed to by all of the Partners.

**Section 12.3.** **Entire Agreement**. This Agreement constitutes the full and complete agreement of the parties hereto with respect to the subject matter thereof. Without limitation of the foregoing, this Agreement supersedes in its entirety the Original Partnership Agreement and all amendments, modifications or changes thereto.

**Section 12.4.** **Effect of Waiver or Consent**. The failure of any Person to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Person's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

**Section 12.5.** **Successors and Assigns.** Subject to Article IX, this Agreement shall be binding upon and inure to the benefit of the Partners and their respective heirs, legal representatives, successors and assigns.

**Section 12.6** **Governing Law. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.**

**Section 12.7**. **Severability.** If any provision of this Agreement is held to be unenforceable, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

-27-

**Section 12.8.** **Further Assurances**. In connection with this Agreement and the transactions contemplated hereby, each Partner shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 12.9.** **Title to Partnership Property**. All property owned by the Partnership, whether real or personal, tangible or intangible, shall be deemed to be owned by the Partnership, and no Partner, individually, shall have any ownership of such property. The Partnership shall hold all of its property in its own name.

**Section 12.10.** **Public Announcements**. The Partnership or any Partner may issue a press release or other public statement with respect to this Agreement or the transactions contemplated hereby only after having providing reasonable advance notice of same to the other Partners.

**Section 12.11.** **No Third Party Beneficiaries**. Except as otherwise provided in Section and in Article VIII it is the intent of the parties hereto that no third-party beneficiary rights be created or deemed to exist in favor of any Person not a party to this Agreement, unless otherwise expressly agreed to in writing by the parties.

**Section 12.12.** **Survival.** The covenants and agreements of the parties hereto shall not survive the termination of the Partnership and the filing of a certificate of cancellation with the Secretary of State of Texas.

**Section 12.13.** **Counterparts**. This Agreement may be executed in any number of counterparts, with each such counterpart constituting an original and all of such counterparts constituting but one and the same instrument.

IN WITNESS WHEREOF, the Partners have executed this Agreement as of the date first above written.

**GENERAL PARTNER**

_____Brady Plant Operators, L.L.C.

By: _____

Terry McIver, President

-28-

## LIMITED PARTNERS

P.O. Box 5562
Midland, Texas 79704

Heartland Investment Partners, Ltd.
By: Western Green Oaks Corp

By: _____
Cary D. Brown, Vice President

P.O. Box 519
Santa Anna, Texas 76878

Huntland Resources, LLC.

By: _____
Terry McIver, President

P.O. Box 519
Santa Anna, Texas 76878

Huntland Properties, Ltd.
By: Cornerstone Operating, L.L.C.

By: _____
Terry McIver, President

P.O. Box 469
Brady, Texas 76825

J Bar T, Ltd.
By: KDLT Resources, LLC

By: _____
Donald Barley, President

P.O. Box 42
Coleman, Texas 76834

Window Operating Company, Ltd.
By: Oak Tree Enterprises, L.L.C.

By: _____
Mike Ray, President

-29-

## Exhibit 3.1

| Name of Partner | Classification |
| --- | --- |
| Brady Plant Operators, L.L.C | General Partner |
| Heartland Investment Partners, Ltd | Limited Partner |
| Huntland Resources, Ltd. | Limited Partner |
| Huntland Properties, Ltd. | Limited Partner |
| Window Operating, Ltd. | Limited Partner |
| J Bar T, Ltd | Limited Partner |

## Exhibit 3.2(c)

| Partners | Address For Notice Purposes | Units | Capital Contribution |
|---|---|---|---|
| Brady Plant Operators, L.L.C. | P.O. Box 519 Santa Anna, Texas | 100 | $6,000 |
| Heartland Investment Partners, Ltd | P.O. Box 5562 Midland, Texas 79704 | 4,500 | $270,000 |
| Huntland Resources, LLC. | P.O. Box 519 Santa Anna, Texas 76878 | 3,000 | $180,000 |
| Huntland Properties, Ltd | P.O. Box 519 Santa Anna, Texas 76878 | 900 | $54,000 |
| Window Operating, Ltd. | P.O. Box 42 Coleman, Texas 76834 | 500 | $30,000 |
| J Bar T, Ltd | P.O. Box 469 Brady, Texas 76825 | 1,000 | $60,000 |
| | | 10,000 | $600,000 |

## Exhibit 3.2(d)

**THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN AGREEMENT OF LIMITED PARTNERSHIP, DATED AS OF NOVEMBER __, 2004(AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE PARTNERSHIP AT ITS PRINCIPAL EXECUTIVE OFFICES.**

Certificate of Units in Loadcraft Industries, Ltd

Certificate No. _____                                    _____ Units

LOADCRAFT INDUSTRIES, LTD., a Texas limited partnership (the "Partnership"), hereby certifies that _____ (the "Holder") is the registered owner of _____ Units in the Partnership (the "Units"). The rights, preferences and limitations of the Units are set forth in that certain Agreement of Limited Partnership of the Partnership dated as of November __, 2004, as amended, supplemented or restated from time to time (the "Agreement"), a copy of which is on file at the principal office of the Partnership.

This Certificate and the Units evidenced hereby are not negotiable or transferable except as provided in the Agreement.

Dated: _____                LOADCRAFT INDUSTRIES, LTD.

                                        By: Brady Plant Operators, L.L.C..,
                                             its general partner

                                        By: _____
                                             Terry McIver, President

**THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACRE OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE PARTNERSHIP SHALL HAVE BEEN DELIVERED TO THE PARTNERSHIP TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT). THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN AGREEMENT OF LIMITED PARTNERSHIP, DATED AS OF NOVEMBER __, 2004 (AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE PARTNERSHIP AT IS PRINCIPAL EXECUTIVE OFFICES.**

## Exhibit 3.3

## Schedule of Additional Units

| | Initial Units | Initial Sharing % | 0-6 months | New Sharing % | 7-12 months | New Sharing % | 12+ months | New Sharing % |
|---|---|---|---|---|---|---|---|---|
| GP | 100 | 1.00% | 100 | 0.90% | 100 | 0.80% | 100 | 0.70% |
| Huntland Resources | 3,000 | 30.00% | 3,000 | 27.00% | 3,000 | 24.00% | 3,000 | 21.00% |
| Huntland Properties | 900 | 9.00% | 900 | 8.10% | 900 | 7.20% | 900 | 6.30% |
| Heartland Investments | 4,500 | 45.00% | 5,610 | 50.50% | 7,000 | 56.00% | 8,785 | 61.50% |
| Window Operating | 500 | 5.00% | 500 | 4.50% | 500 | 4.00% | 500 | 3.50% |
| JBarT | 1,000 | 10.00% | 1000 | 9.00% | 1,000 | 8.00% | 1,000 | 7.00% |
| | 10,000 | 100% | 11,110 | 100.00% | 12,500 | 100.00% | 14,285 | 100.00% |

| | | | 0-6 months | | 7-12 months | | 12+ months | |
|---|---|---|---|---|---|---|---|---|
| Additional Units to be Issued to Heartland | | | 1,110 | | 1,390 | | 1,785 | |

## Exhibit 6.7

### Initial Board of Directors of General Partner

•

Designated by Heartland (3)

Cary D. Brown

Dale A. Brown

W. Stirling Warren

Designated by Huntland Resources and Huntland Properties (2)

Terry McIver

Donald Barley

# UNANIMOUS CONSENT
## OF
## SOLE MEMBER
## OF
## BRADY PLANT OPERATORS, L.L.C.

### November 11, 2020

The undersigned, being the sole Member of Brady Plant Operators, L.L.C., a Texas Limited Liability Company, acting pursuant to the provisions of the Texas Business Organizations Code, Section 6.201, hereby consents that when the sole Member has signed this consent or an exact counterpart thereof, the resolutions as hereinafter set forth shall be deemed to have been adopted to the same extent and shall have the same force and effect as if adopted at a formal meeting of the Members of the Company, duly called and held for the purpose of acting upon a proposal to adopt such resolution, to wit:

**Whereas,** the Company is the general partner of Loadcraft Industries, Ltd.; and

**Whereas,** the Company has decided that it is advantageous for the Company to update the Managers for the Company due to the sudden and unexpected departure of Charles Hinkle as the Chief Financial Officer for Loadcraft Industries, Ltd.

**Now, Therefore, Be It:**

**Resolved,** That Charles Hinkle be removed as a Manager of the Company effective November 11, 2020.

**Further Resolved,** That the Managers of the Company effective November 11, 2020, be as follows:

Terry McIver

Grady McIver

Glorious Splendor, LLC

**Dated and Effective** this 11th day of November, 2020.

Terry McIver

EXHIBIT "C"

**7/21/2021 10:23 AM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-21-002825**
**Chloe Jimenez**

### CAUSE NO. D-1-GN-21-002825

| | | |
|---|---|---|
| **ALPHONSO ENERGY, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **CHARLES HINKLE, and NESTOR** | § | |
| **OUTCOMES, LLC,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **98th JUDICIAL DISTRICT** |
| | § | |
| **LOADCRAFT INDUSRIES, LTD.,** | § | |
| **TERRY MCIVER, and GLIDER** | § | |
| **PRODUCTS, LLC** | § | |
| | § | |
| *Defendants/Third-Party Plaintiffs.* | § | **TRAVIS COUNTY,  TEXAS** |

### DEFENDANTS' MOTION TO TRANSFER VENUE, ORIGINAL ANSWER AND COUNTER-CLAIM SUBJECT THERETO, AND THIRD-PARTY PETITION SUBJECT THERETO

TO THE HONORABLE COURT:

NOW COMES, LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC, Defendants in the above numbered and entitled cause and file this their Motion to Transfer Venue and Original Answer, Counter-Claim and Third Party Petition subject thereto in accordance with Rules 85, 86, 87 and 89, Texas Rules of Civil Procedure, and respectfully moves the Court to transfer venue of this case from Travis County, Texas to McCullough County, Texas, and in support thereof respectfully shows the following:

### MOTION TO TRANSFER VENUE

1.

The county in which this action is filed is not a county of proper venue.  In this connection, Defendants LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC would respectfully show the Court that:

---

**EXHIBIT "D"**

(a)     Plaintiffs' claims of contractual venue fail under Tex. Civ. P. & Rem. Code Section 15.020 as these contracts do not fall under the major transaction rule and generally contractual venue is invalid. Further, Plaintiffs' reliance on Section 15.035 is misplaced as that requires the contract to be performable in the county of venue. Finally, the contracts were unconscionable at the time executed and were based on collusion amongst the Plaintiffs, as two of the contracts were in breach the moment they were signed.

(b)     All or a substantial part of the events or omissions giving rise to the alleged claims occurred in McCullough County, Texas.

(c)     Plaintiff ALPHONSO ENERGY, LLC's principal place of business is in Travis County, Austin, Texas.

(d)     Plaintiff NESTOR OUTCOMES, LLC's principal place of business is in Bell County, Temple, Texas.

(e)     Defendant LOADCRAFT INDUSTRIES, LTD.'s principal place of business is in Brady, McCullough County, Texas.

(f)     Defendant TERRY MCIVER resided in San Saba County, San Saba, Texas, at the time of the alleged causes of actions accrued.

(g)     Defendant GLIDER PRODUCTS, LLC's principal place of business is in McCullough County, Brady, Texas.

2.

**No Contractual Venue**

"In general, the fixing of venue by contract is invalid. *In re Great Lakes Dredge & Dock Co.,* 251 S.W.3d 68, 76 (Tex. App.-Corpus Christi 2008, orig. proceeding) (citing *Fid. Union Life Ins. Co. v. Evans,* 477 S.W.2d 535, 537 (Tex.1972)). An exception to that general rule appears in section 15.020 of the civil practice and remedies code, which states that contractual venue selection clauses may be enforceable in cases involving "major transactions." TEX. CIV. PRAC. & REM.CODE ANN. § 15.020. A "major transaction" is "a transaction evidenced by a written agreement under which a person pays or receives, or is obligated to pay or entitled to

receive, consideration with an aggregate stated value equal to or greater than $1 million." *Id.* § 15.020(a)." *Shamoun & Norman, LLP v. Yarto Intern. Group, LP*, 398 S.W.3d 272, 293 (Tex. App.—Corpus Christi 2012, pet. dism'd). Each of the bailment contracts (Exhibits 1-4 *Plaintiff's original Petition*) relied upon by the Plaintiffs do not meet the definition of a "major transaction." Thus, there is no contractual venue.

Even if the bailment contracts are to be taken as one contract to qualify as a major transaction, as exception to Section 15.020 is applicable here as the bailment contracts were unconscionable at the time they were executed. *Id.* 15.020(d)(1). The first two bailment contracts (Exhibits 1 and 2) were in breach the very moment they were executed as the equipment had already been produced sold and shipped to the third-party purchaser. A contract that is in breach when executed is by definition, unconscionable. The two bailment contracts represented by Exhibits 3 and 4 are not in breach as the equipment has yet to be either manufactured, sold or both, but are still unconscionable as they were also executed by two of the Plaintiffs in a collusive effort to unreasonably and unnecessarily attempt to bind Defendant Loadcraft to a bailment contract that was inappropriate under the circumstances.

Finally, under Tex. Civ. P. & Rem. Code Section 15.035, it states that contractual venue is based on performance of the contract in a particular county and suit may be filed in that particular county or in the county of the Defendant's domicile. Here, both of these options indicate McCullough County is the county of proper venue since a review of the contracts themselves involve the production and sale of equipment in McCullough County where Loadcraft is based.

Accordingly, there is no contractual basis for holding venue in Travis County.

3.

**General Venue**

The Plaintiffs claim that the acts or omissions complained of occurred in Travis County is simply false. All or a substantial part of the claimed wrongful actions occurred in McCullough County. See Affidavit of Terry McIver attached hereto.  This action should be transferred to McCullough County, Texas.  McCullough County is the proper venue under the general venue rule, again, because it is the county where all or a substantial part of the events or omissions giving rise to the claim occurred and where Defendants LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, and GLIDER PRODUCTS, LLC were involved with the Plaintiffs. McCullough County is proper because it is the principal place of business for these Defendants. See Tex. Civ. P. & Rem. Code (V.A.T.S. 2018), Section 15.002(a)(1) and (3).  Further, the obligations of Defendant Loadcraft under the bailment contracts were based on performance in McCullough County, not Travis County.

Plaintiff Alphonso Energy, LLC apparently has an office address in Austin, Texas, but it is unknown if this is the principal place of business in Texas.

Plaintiff Charles Hinkle currently lives in South Carolina and Nestor Outcomes, LLC is a Texas corporation.

Defendant Loadcraft hired Plaintiff HINKLE as a consultant, which became an employment situation and was working for Defendant Loadcraft as CEO and CFO and then just CFO at all times material to the complaints in Brady, McCullough County, Texas. See affidavit of Terry McIver attached hereto.

4.

### Transfer for Justice and Convenience

Alternatively, Defendant LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC asks the Court to transfer the case to McCullough County in the interest of justice and for the convenience of the parties and witnesses under the authority of Texas Civil Practice & Remedies Code section 15.002(b).

**Interest of Justice**

Given that unconscionable bailment contracts, in breach when executed, provide for the contractual venue in Travis County, the interest of justice provides for the permissive venue for McCullough County.

**Convenience**

Maintaining this suit in TRAVIS County will impose an economic and personal hardship on Defendant LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC. Tex. Civ. P. & Rem. Code Section 15.002(b)(1).

The balance of interest of all parties weighs in favor of the action being brought in McCullough County. Tex. Civ. P. & Rem. Code Section 15.002(b)(2). Specifically, witnesses to the alleged conduct, the location of the actions giving rise herein; and given that the Plaintiff HINKLE himself resided in McCullough County at all material times makes McCullough County the forum conveniens of choice.

The transfer to McCullough County will not cause a hardship or an injustice for any other party. Tex. Civ. P. & Rem. Code Section 15.002(b).

## ORIGINAL ANSWER SUBJECT TO THE MOTION TO TRANSFER VENUE

### GENERAL DENIAL

5.

Defendants LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC denies each and every, all and singular, the allegations made and contained in the Plaintiff's Original Petition and any petition which the Plaintiffs may hereinafter file by way of amendment or supplement, for the purpose of requiring the Defendants or Plaintiffs to prove said allegations by a preponderance of the evidence to a fair and impartial jury in accordance with the laws of this State.

### AFFIRMATIVE DEFENSES

6.

Pleading further, if same be necessary, the Defendants LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC would show that the Plaintiffs claims, are barred in whole or in part, due to Plaintiffs' unclean hands and collusion by and between Charles Hinkle and Brian Alphonso to perpetuate a scheme to defraud Defendant Loadcraft and Glider.

7.

Pleading further, if same be necessary, the Defendants LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC would show by way of affirmative defense that the Plaintiffs' claims are barred as the very actions they are complaining of were committed by or done at the direction of Plaintiff Charles Hinkle in agreement with Brian Alphonso and Alphonso Energy.

## ORIGINAL COUNTERCLAIM AGAINST CHARLES HINKLE

8.

**Conversion/Misappropriation of Corporate Funds**

Plaintiff Charles Hinkle was the CEO and CFO of Loadcraft from May of 2016 until November of 2019. He then continued as CFO until he abruptly left in November of 2020 without notice. Before Mr. Hinkle resigned in November of 2020, he used Loadcraft money to pay numerous wire transfers to a lady friend in Mexico in the total sum of $33,745.00. In 2017 and 2018, Hinkle paid himself several draws generally coinciding with capital contributions from Alphonso Energy and/or receipts from equipment sales, totaling at least $85,000.00. Further, there is an additional $343,000.00 in unexplained draws to Mr. Hinkle which are also believed to be above any consulting fee, salary, wages, or expenses. See affidavit of Terry McIver attached hereto.

The above represent unauthorized draws and wire transfers directed by Mr. Hinkle that were not done in the furtherance of Loadcraft's interest, but purely for the personal gain of Mr. Hinkle. As such, Defendant/Third-Party Plaintiff Loadcraft sues by counter-claim against Charles Hinkle for the return of these misappropriated funds and interest thereon as allowed by law.

## DEFENDANTS/THIRD-PARTY PLAINTIFF TERRY MCIVER'S ORIGINAL PETITION AGAINST BRIAN ALPHONSO

9.

Statement of Discovery Level

Pursuant to T.R.C.P. 47, Third-Party Plaintiffs states that the damages sought by Plaintiffs hereby are within the jurisdictional limits of this Court and discovery in this case is proper under

Level Three of T.R.C.P. 190.

Parties and Service

Defendant and Third-Party Plaintiff, Terry McIver, is an individual residing in San Saba, Texas.

Third-Party Defendant, Brian Alphonso, is an individual who may be served with process by serving him at 7920 FM 2244 Rd., Austin, Texas 78746, or wherever he may be found, for which citation should issue.

Jurisdiction and Venue

Venue is proper in McCullough County, Texas, because generally, the venue of cross actions, counter-claims and third-party claims are determined by the venue of the underlying suit, which as noted above, should be in McCullough County. Here, the complained of actions arose out of and were directly related to the subject matter at issue in McCullough County, and the amount in controversy is within the jurisdictional limits of this Court.

Causes of Action Against Third-Party Defendant Brian Alphonso

**Civil Assault**

Third-Party Defendant Brian Alphonso, in front of several witnesses, did threaten imminent bodily harm and death to Defendant/Third-Party Plaintiff. This civil assault arose out of an invited meeting of the parties to discuss resolution of their differences. Instead, it was a hostile and threatening demand for various items which escalated to the threat by Brian Alphonso to kill Terry McIver. See affidavit of Terry McIver attached hereto.

Third-Party Defendant Alphonso's constitute civil assault. Defendant/Third-Party Plaintiff McIver believed the harm was imminent and the threats were real as they were repeated and made with clear animosity and vehemence.

McIver was apprehensive and fearful. As such, McIver now sues for damages arising out of and caused by Alphonso's civil assault.

**Intentional Infliction of Emotional Distress**

Alternatively, in the event the above threats by Third Party Defendant Brian Alphonso are not adjudicated as civil assault, then it is clear that Alphonso's actions rise to the level of actionable intentional infliction of emotional distress.

Clearly, the conduct of Alphonso was intentional or at the least reckless, causing severe emotional distress for McIver. These threats were real and caused McIver to be guarded and watchful for Alphonso. McIver was fearful and worried over these threats and the stress and anxiety persisted long after the threats themselves.

Alphonso's conduct was clearly extreme and outrageous. The conduct was threatening, harassing and clearly designed to scare, humiliate, intimidate and coerce McIver into unwanted and unnecessary actions.

Causation; damages.

The conduct by the Third-Party Defendant as described in the preceding paragraphs for civil assault, or in the alternative, intentional infliction of emotional distress, was a producing and proximate cause of McIver's apprehension, fear, anxiety, stress and mental anguish in general. As such, McIver seeks compensatory damages and redress from Alphonso, along with pre and post judgment interest and court costs.

Further, Third-Party Defendant's actions give rise to exemplary damages for which McIver now sues.

## PRAYER

10.

WHEREFORE, PREMISES CONSIDERED, Defendants and Third-Party Plaintiffs LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC, respectfully request that upon hearing, the motion to transfer venue to McCullough County, Texas be granted, and that the Court enter its order transferring this cause to a proper district court of McCullough County, Texas, pursuant to Rule 89, Texas Rules of Civil Procedure; and that upon final hearing or trial of this cause, the Plaintiffs take nothing by way of their suit, that Third-Party Defendant be cited according to law to appear and answer herein, that damages and costs be awarded to the Defendants LOADCRAFT INDUSTRIES, LTD., TERRY MCIVER, AND GLIDER PRODUCTS, LLC, on their counter-claim and third-party claim and for such other and further relief to which Defendants and Third-Party Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

**MCMAHON SUROVIK SUTTLE, P.C.**
P.O. Box 3679
Abilene, Texas 79604
(325) 676-9183 Telephone
(325) 676-8836 FAX

BY:   /s/ Robert B. Wagstaff                    
      **ROBERT B. WAGSTAFF**
      State Bar No. 20665000
      rwagstaff@mcmahonlawtx.com

ATTORNEYS FOR DEFENDANTS/
THIRD-PARTY PLAINTIFFS,
LOADCRAFT INDUSTRIES, LTD.,
TERRY MCIVER, AND
GLIDER PRODUCTS, LLC

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that a true copy of the above and foregoing instrument was forwarded to all attorneys of record on this 21st day of July, 2021, in accordance with the Texas Rules of Civil Procedure.

                /s/ Robert B. Wagstaff                    
                ROBERT B. WAGSTAFF

CAUSE NO. D-1-GN-21-002825

| | | |
|---|---|---|
| **ALPHONSO ENERGY, LLC,** | § | **IN THE DISTRICT COURT OF** |
| **CHARLES HINKLE, and NESTOR** | § | |
| **OUTCOMES, LLC,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **98th JUDICIAL DISTRICT** |
| | § | |
| **LOADCRAFT INDUSRIES, LTD.,** | § | |
| **TERRY MCIVER, and GLIDER** | § | |
| **PRODUCTS, LLC** | § | |
| | § | |
| *Defendants/Third-Party Plaintiffs.* | § | **TRAVIS COUNTY,  TEXAS** |

### AFFIDAVIT OF TERRY MCIVER

BEFORE ME, the undersigned authority, personally appeared TERRY MCIVER, who being duly sworn, deposed as follows:

"My name is TERRY MCIVER.  I am over 18 years of age, of sound mind and capable of making this Affidavit.  I am one of the named defendants above, as well as the managing member of Brady Plant Operators LLC, the general partner of Defendant Loadcraft Industries, Ltd., and the managing member of Defendant Glider Products, LLC. I have also been the CEO of Defendant Loadcraft since November of 2019. Accordingly, the factual averments stated in this Affidavit are within my personal knowledge and are true and correct.

"I have read the Plaintiffs' Original Petition and request for injunctive relief. All of the alleged acts of wrongdoing, which are categorically denied, all took place in Brady, McCullough County, Texas. Further, I have reviewed the venue facts as set out in the Motion to Transfer Venue and Original Answer subject thereto and these are true and correct as well.

Plaintiff Charles Hinkle was the CEO and CFO of Loadcraft from May of 2016 until November of 2019 and then continued as CFO until he abruptly left in November of 2020 without notice. During his time with Loadcraft as CEO, he was making the day-to-day decisions, including dealing directly with Brian Alphonso and Plaintiff Alphonso Energy LLC.  The contracts attached as Exhibits 1-4 to Plaintiffs' original petition in which they rely to support their contractual venue

claim were negotiated directly by and between Charles Hinkle and Brian Alphonso. While I was aware that Mr. Alphonso, by and through Alphonso Energy, was making occasional capital contributions, I was unaware of these agreements or the nature thereof. I do not understand the bailment issue or why it was done this way. In fact, upon review of these bailment contracts, the first two represented by Exhibits 1 and 2 to the Plaintiff's Original petition, were in breach by Loadcraft the minute these were executed since the subject equipment had already been sold and delivered and payment received. Both Mr. Hinkle and Mr. Alphonso were aware of the equipment already being sold, money received and shipped, but intentionally signed these contracts putting Loadcraft immediately in technical breach. The equipment subject to the Exhibits 3 and 4 bailment contracts have yet to be completed, sold and delivered, so these contracts, to the extent they are even valid, are not in breach.

The idea to execute these bailment contracts was evidently Charles Hinkle's in consult with Brian Alphonso. I was not consulted nor was I aware of what type of loan/contractual agreement had been worked out with Alphonso Energy until after I became CEO in late 2019. At that point we were working on the manufacturing and sale of the equipment subject to Exhibits 3 and 4, which continues to this day.

After Mr. Hinkle was removed as CEO in November 2019,and I became CEO again, it came to my attention that he had used Loadcraft money to pay numerous wire transfers to a lady friend in Mexico in the total sum of $33,745.00.  Further, he was paying himself substantial draws generally coinciding with capital contributions from Alphonso Energy, totaling at least $85,000.00. There is an additional $343,000.00 in unexplained draws to Mr. Hinkle which do not coincide with any particular expense or consultant payment.

Finally, prior to the suit being filed, a meeting was held in Austin, Texas on March 4, 2021, and the people in attendance were Katherine Walters (attorney for Plaintiffs), Brian Alphonso, Andre Alphonso (son of Brian), Terry McIver, Gary Weatherman and Kendra Oldham from Loadcraft, with Charles Hinkle and Rob Walker in attendance via Zoom. The purpose of the meeting was to see if we could resolve our differences and work together going forward.

During the course of the meeting, there were several discussions concerning Defendant Glider Products, LLC. Brian Alphonso indicated that he wanted controlling interest in Glider

Products, LLC and his "loans" paid back from Loadcraft. When this was not agreeable, the meeting deteriorated and Brian Alphonso told his lawyer, Katherine Walters, to move froward with litigation with an open retainer. Brian Alphonso then turned to me and stated, 'I'll kill you.' He made a slicing motion across his own neck when he said this, pointed at me, and repeated, 'I'll kill you and come after you with everything I have and I have the means to do it.' He further stated, 'you don't cheat an Indian without paying the price, I will kill you and one swipe of a sword and you're dead, while making a motion with his hand indicative of cutting off my head.'

Brian Alphonso had previously pointed his finger and told Kendra Oldham, Loadcraft's controller, she better be careful or he would come after her. I know Kendra felt threatened and then when Brian Alphonso threatened to kill me and cut my head off with a sword, I was fearful and apprehensive as he was snarling in an aggressive demeanor, sweating and his upper lip was shaking. I believed the threat to be imminent and so we proceeded to leave the meeting as soon as we could.

Further Affiant sayeth not."

TERRY MCIVER, Owner and Managing Member
of
LOADCRAFT INDUSTRIES, LTD. and
GLIDER PRODUCTS, LLC

SUBSCRIBED AND SWORN TO BEFORE ME on July 20, 2021, by Terry McIver.

SANDI ELIZABETH GREAVES
Notary ID #129902499
My Commission Expires
July 30, 2022

Notary Public, State of Texas

**Affidavit of Terry McIver**                                                                  **Page 3 of 3**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Amanda Livezey on behalf of Robert Wagstaff
Bar No. 20665000
alivezey@mcmahonlawtx.com
Envelope ID: 55551144
Status as of 7/22/2021 1:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Sheldon ERichie | | srichie@rg-austin.com | 7/21/2021 10:23:52 AM | SENT |
| Katherine JWalters | | kwalters@rg-austin.com | 7/21/2021 10:23:52 AM | SENT |
| Robert BWagstaff | | rwagstaff@mcmahonlawtx.com | 7/21/2021 10:23:52 AM | SENT |
| Laurie Vann | | lvann@mss.law | 7/21/2021 10:23:52 AM | SENT |
| Lorri Stevenson | | lstevenson@rg-austin.com | 7/21/2021 10:23:52 AM | SENT |

## WRITTEN CONSENT OF THE MANAGERS OF BRADY PLANT OPERATORS, LLC
## IN LIEU OF A SPECIAL MEETING OF THE MANAGERS

The undersigned Members and Managers of Brady Plant Operators, LLC (the "Company"), pursuant to Sections 101.356 and 101.359 of the Texas Business Organizations Code, being the majority of the Managers of the Company, do hereby waive notice and call of, and in lieu of a special meeting of the Managers, do hereby consent that the following resolutions be deemed to be adopted to the same extent and effect as if adopted at formal meetings of the Managers, duly called and held for the purpose of acting upon the proposals to enact such resolutions which are as follows:

*Actions by Managers*

**WHEREAS**, the Managers desire to retain Waller Lansden Dortch & Davis, LLP as bankruptcy counsel for Loadcraft Industries, Ltd.;

**NOW THEREFORE, BE IT:**

**RESOLVED,** that Waller Lansden Dortch & Davis LLP are retained as bankruptcy counsel for Loadcraft Industries, Ltd.; and

**FURTHER RESOLVED** that Brian Alphonso, the authorized representative of Glorious Splendor Too, LLC is authorized to execute any and all documents necessary to retain the services of Waller Lansden Dortch & Davis LLP.

*Actions by Managers*

**WHEREAS**, the Managers have determined that it is in the best interest of the company for Waller Lansden Dortch & Davis LLP file Chapter 11 bankruptcy for Loadcraft Industries, Ltd.;

**NOW THEREFORE, BE IT:**

**RESOLVED,** that Waller Lansden Dortch & Davis LLP is authorized to file Chapter 11 bankruptcy for Loadcraft Industries, Ltd.

*Actions by Managers*

**WHEREAS** Terry McIver has not operated Loadcraft Industries, Ltd. using good business judgment.  In fact, there is evidence that Mr. McIver has failed to fulfill his duties, violated the by-laws, violated the Company Agreement and has breached his fiduciary duties to Loadcraft Industries, Ltd.

**NOW THEREFORE, BE IT:**

**RESOLVED,** that Charles Hinkle is authorized to terminate Terry McIver and any

**EXHIBIT "E"**

other person(s) he believes would be in the best interest of Loadcraft Industries, Ltd.; and

**FURTHER RESOLVED,** that Charles Hinkle is to remove Terry McIver's authority to act on behalf of Loadcraft Industries, Ltd. with any banking institution; and

**FURTHER RESOLVED,** that Charles Hinkle is to take possession of all keys, computers, thumb drives, and other items of Loadcraft Industries, Ltd from Terry McIver and to escort him off of the Loadcraft Industries, Ltd. or Glider Products LLC properties; and

**FURTHER RESOLVED**, - that Charles Hinkle has all necessary authority to direct the activities of Loadcraft Industries, Ltd. and to appear for Loadcraft in the Chapter 11 case or any other legal matter as its representative.

IN THE EVENT THAT THIS WRITTEN CONSENT IS NOT EXECUTED BY ALL OF THE MANAGERS OF THE COMPANY, THEN, PURSUANT TO SECTION 101.358 OF THE TEXAS BUSINESS ORGANIZATIONS CODE, THE UNDERSIGNED MEMBERS OF THE COMPANY, BEING MANAGERS HOLDING NOT LESS THAN THE MINIMUM NUMBER OF VOTES THAT WOULD BE NECESSARY TO TAKE THE ACTIONS HEREUNDER AT A MEETING AT WHICH ALL MANAGERS ENTITLED TO VOTE ON SUCH ACTIONS WERE PRESENT AND VOTED, DO HEREBY WAIVE NOTICE AND CALL OF, AND IN LIEU OF A SPECIAL MEETING OF THE MANAGERS, DO HEREBY CONSENT THAT THE FOREGOING RESOLUTIONS BE DEEMED TO BE ADOPTED TO THE SAME EXTENT AND EFFECT AS IF ADOPTED AT A FORMAL MEETING OF THE MANAGERS DULY CALLED AND HELD FOR THE PURPOSE OF ACTING UPON THE PROPOSALS TO ENACT SUCH RESOLUTIONS.

EXECUTED TO BE EFFECTIVE on the first date on which this Written Consent is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers, by hand delivery or certified or registered mail, return receipt requested.

GLORIOUS SPLENDOR TOO, LLC            CHARLES HINKLE

_Charles Hinkle_
Charles Hinkle (Dec 23, 2021 11:37 EST)

BY: _B Alphoso_

Brian Alphonso, Member                 Dec 23, 2021
Date: _____          Date: _____

TERRY McIVER

_____

Date: _____

# 2021-12-23 Written Consent - Brady Operators Managers

**Final Audit Report**                                    2021-12-23

| | |
|---|---|
| Created: | 2021-12-23 |
| By: | Katherine Walters (kwalters@rg-austin.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAoTD24aM9U0SKu9E5Ly1cIO-Zq-Iu6A_P |

## "2021-12-23 Written Consent - Brady Operators Managers" History

📄 Document created by Katherine Walters (kwalters@rg-austin.com)
2021-12-23 - 7:00:40 PM GMT- IP address: 64.183.177.162

📧 Document emailed to Charles Hinkle (chinkle@zylotherapeutics.com) for signature
2021-12-23 - 7:01:24 PM GMT

📄 Email viewed by Charles Hinkle (chinkle@zylotherapeutics.com)
2021-12-23 - 7:02:03 PM GMT- IP address: 173.239.199.129

✍️ Document e-signed by Charles Hinkle (chinkle@zylotherapeutics.com)
Signature Date: 2021-12-23 - 7:03:27 PM GMT - Time Source: server- IP address: 173.239.199.129

✓ Agreement completed.
2021-12-23 - 7:03:27 PM GMT

**Adobe Sign**



**LCI-API-RIGS**
**Loadcraft Industries LTD.**
**Manufacturing Facilities at Brady, Texas**
**325-597-2911 • 325-597-0781**

LTD

December 29, 2021

To Terry McIver:

The managers of the General Partner of Loadcraft have decided to immediately terminate your employment with Loadcraft for cause. There is evidence that you have attempted to enter into transactions with third parties without proper approval or consent of the General Partner, failed to fulfill your duties, violated the Company's by-laws, violated the Company Agreement and have breached your fiduciary duties to Loadcraft Industries, Ltd. Your employment with the company as well as your position as a manager of Brady Plant Operators, LLC is TERMINATED EFFECTIVE IMMEDIATELY.

You are directed to turn-in all company assets including but not limited to: keys, computer, materials and documents, cell phone to Charles Hinkle.

You are directed and instructed to no longer use the company name; attempt to sign any documents on behalf of the company; represent to any third-party that you are an employee, officer, or contractor to the company; interfere with the company and its employees; customers or vendors in any way except to the extent of your actual interest in the general partner of Loadcraft; and subject to the partnership agreement as it has been amended and modified.

The Company will provide all notices to you that are required at law and will provide all benefits, if any, required by law.

Loadcraft Industries, Ltd.
by the Authorized Manager of its General Partner
Brady Plant Operators, LLC


_____
Charles Hinkle, Authorized Manager

**WRITTEN CONSENT OF THE MAJORITY OF THE LIMITED PARTNERS OF
LOADCRAFT INDUSTRIES, LTD.
IN LIEU OF A SPECIAL MEETING OF THE LIMITED PARTNERS**

The undersigned majority of the limited partners of Loadcraft Industries, Ltd. (the "Company"), pursuant to Sections 6.201, 6.202 of the Texas Business Organizations Code and 6.11 of the Limited Partnership Agreement, being the majority of the limited partners of the Company, without the requirement of a notice and meeting do hereby consent that the following resolutions be deemed to be adopted to the same extent and effect as if adopted at formal meetings of the limit partners, duly called and held for the purpose of acting upon the proposals to enact such resolutions which are as follows:

*Actions by Majority of Limited Partners*

**WHEREAS**, the majority of the limited partners desire to remove Brady Plant Operators LLC as the general partner of the Company; and

**WHEREAS,** the majority of the limited partners desire to appoint Glorious Splendor Too, LLC as the new general partner of the Company; and

**WHEREAS**, the majority of the limited partners desire to continue the Company.

**NOW THEREFORE, BE IT:**

**RESOLVED,** that Brady Plant Operators LLC is removed as the general partner of the Company and Glorious Splendor Too, LLC is elected as the new general partner of the Company; and

**RESOLVED**, that the limited partnership Loadcraft Industries, Ltd. shall continue.

EXECUTED TO BE EFFECTIVE on the first date on which this Written Consent is delivered to the Company by delivery to its registered office, its principal place of business, or the limited partners, by hand delivery or electronic mail.

GLORIOUS SPLENDOR TOO, LLC by Brian Alphonso, Manager

NESTOR OUTCOMES, LLC by Charles Hinkle, Manager

BY: _Brian Alphonso, Manager_

Date: December 31, 2021

Date: __December 31, 2021__

## WRITTEN CONSENT OF THE MANAGERS OF GLORIOUS SPLENDOR TOO, LLC
## IN LIEU OF A SPECIAL MEETING OF THE MANAGERS

The undersigned Members and Managers of Glorious Splendor Too, LLC (the "Company"), pursuant to Sections 101.356 and 101.359 of the Texas Business Organizations Code, being the majority of the Managers of the Company, do hereby waive notice and call of, and in lieu of a special meeting of the Managers, do hereby consent that the following resolutions be deemed to be adopted to the same extent and effect as if adopted at formal meetings of the Managers, duly called and held for the purpose of acting upon the proposals to enact such resolutions which are as follows:

*Actions by Managers*

**WHEREAS** Terry McIver has not operated Loadcraft Industries, Ltd. using good business judgment.  In fact, there is evidence that Mr. McIver has failed to fulfill his duties, violated the Partnership Agreement and has breached his fiduciary duties to Loadcraft Industries, Ltd.

**NOW THEREFORE, BE IT:**

**RESOLVED,** that Charles Hinkle is authorized to terminate Terry McIver and any other person(s) he believes such termination(s) would be in the best interest of Loadcraft Industries, Ltd.; and

**FURTHER RESOLVED,** that Charles Hinkle is authorized to remove Terry McIver's authority to act on behalf of Loadcraft Industries, Ltd. with any banking institution; and

**FURTHER RESOLVED,** that Charles Hinkle is authorized to take possession of all keys, computers, thumb drives, and other items of Loadcraft Industries, Ltd from Terry McIver and to escort him off of the Loadcraft Industries, Ltd. or Glider Products LLC properties; and

**FURTHER RESOLVED,** that Charles Hinkle has all necessary authority to direct the activities of Loadcraft Industries, Ltd. and to appear for Loadcraft in the Chapter 11 case or any other legal matter as its representative; and

**FURTHER RESOLVED**, that Charles Hinkle is employed by Loadcraft Industries, Ltd. as the Chief Executive Officer of Loadcraft Industries, Ltd.

IN THE EVENT THAT THIS WRITTEN CONSENT IS NOT EXECUTED BY ALL OF THE MANAGERS OF THE COMPANY, THEN, PURSUANT TO SECTION 101.358 OF THE TEXAS BUSINESS ORGANIZATIONS CODE, THE UNDERSIGNED MEMBERS OF THE COMPANY, BEING MANAGERS HOLDING NOT LESS THAN THE MINIMUM NUMBER OF VOTES THAT WOULD BE NECESSARY TO TAKE THE ACTIONS HEREUNDER AT A MEETING AT WHICH ALL MANAGERS ENTITLED TO VOTE ON SUCH ACTIONS

WERE PRESENT AND VOTED, DO HEREBY WAIVE NOTICE AND CALL OF, AND IN LIEU OF A SPECIAL MEETING OF THE MANAGERS, DO HEREBY CONSENT THAT THE FOREGOING RESOLUTIONS BE DEEMED TO BE ADOPTED TO THE SAME EXTENT AND EFFECT AS IF ADOPTED AT A FORMAL MEETING OF THE MANAGERS DULY CALLED AND HELD FOR THE PURPOSE OF ACTING UPON THE PROPOSALS TO ENACT SUCH RESOLUTIONS.

  EXECUTED TO BE EFFECTIVE on the first date on which this Written Consent is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers, by hand delivery or electronic mail.

GLORIOUS SPLENDOR TOO, LLC     GLORIOUS SPLENDOR TOO, LLC

BY: _____    BY: _____

  Brian Alphonso, Manager     Nisha Alphonso, Manager

Date: December 31, 2021      Date: December 31, 2021